IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| FELIX W. SCHUCK , a single individual | ) | |
| | ) | No.  37213-8-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| GORDON BECK and JANE DOE BECK, | ) | |
| individually, as well as the marital | ) | |
| community thereof;  TIM JACKSON and | ) | |
| ROBERTA JACKSON, individually, as | ) | |
| well as the marital community thereof; | ) | |
| IBEX CONSTRUCTION, INC., a | ) | |
| Washington corporation; INLAND | ) | PUBLISHED OPINION |
| NORTHWEST EQUIPMENT AUCTION, | ) | |
| INC., d/b/a REINLAND | ) | |
| AUCTIONEERS, a ) 16 Washington | ) | |
| corporation; REINLAND, INC., ) d/b/a/ | ) | |
| REINLAND EQUIPMENT AUCTION, | ) | |
| an Idaho corporation; REINLAND | ) | |
| PROPERTIES, L.L.C., an Idaho limited | ) | |
| !ability company; THOMAS REINLAND | ) | |
| and KUNY A REINLAND, individually, | ) | |
| as well as the marital community thereof; | ) | |
| ASHLEY REINLAND and JOHN DOE | ) | |
| REINLAND, individually, as well as the | ) | |
| marital community thereof; and JOHN | ) | |
| DOE 1-5, entities or individuals, | ) | |
| | ) | |
| Petitioners. | ) | |

FEARING, J. —

*Where damage is sustained by the latter through the nonculpable activities of the former, who should bear the loss the man who caused it or a 'third person', as Judge*

*Hand says, 'who has no relation to the explosion, other than that of injury'?"* Langan v. Valicopters, Inc., *88 Wn.2d 855, 860, 567 P.2d 218 (1977) (quoting* Loe v. Lenhardt, *227 Or. 242, 253, 362 P.2d 312 (1961)).*

Unfortunately interesting appeals often arise from tragedy.

This appeal asks whether the trial court properly granted, in part and only in part, summary judgment to defendants Tom Reinland, his wife, and his related companies (collectively Tom Reinland), who sold scrap metal to Pacific Steel & Recycling (Pacific) for recycling. Plaintiff Felix Schuck, an employee of Pacific, suffered injuries when the puncture of a metal cylinder tank sold by Tom Reinland suddenly released chlorine. Schuck brought suit against supplier Reinland asserting negligence claims based on common law and the *Restatement (Second) of Torts*, an absolute liability claim for engaging in an abnormally dangerous activity, and a statutory claim under the Hazardous Waste Management Act (HWMA), chapter 70.105 RCW.

Tom Reinland moved for summary judgment on all claims and the trial court granted partial summary judgment dismissal of Schuck's negligence claim under *Restatement (Second) of Torts* § 392 (Am. Law Inst. 1965) and absolute liability claims based on the *Restatement (Second) of Torts* §§ 519 and 520 (Am. Law Inst. 1977). The trial court denied summary judgment as to Schuck's claims based on the *Restatement (Second) of Torts* § 388 (Am. Law Inst. 1965), the Hazardous Waste Management Act, and common law negligence. Reinland appeals the denial of dismissal of the three claims, and Schuck cross appeals on the claims which the trial court rejected.

2

We affirm in part and reverse in part the superior court's ruling. We hold that Tom Reinland is entitled to summary judgment on the common law negligence claim and the Hazardous Waste Management Act claim. We hold that Reinland is not entitled to summary judgment under *Restatement (Second) of Torts* §§ 388, 392, 519, and 520. We instead grant summary judgment to Schuck on his claim of absolute liability, based on an abnormally dangerous activity, under *Restatement (Second) of Torts* §§ 519 and 520. Our ruling on absolute liability renders decisions on other claims unnecessary. Nevertheless, we address the other causes of action because of the difficulty faced in assessing whether Tom Reinland engaged in an abnormally dangerous activity and, in turn, the possibility of reversal of our decision by the Washington Supreme Court. The numerous theories of liability asserted by Felix Schuck prolong this opinion.

FACTS

This appeal concerns the handling of a cylindrical chlorine tank owned at the time of the tragedy by Tom and Kunya Reinland and removed from property owned by Tim and Robert Jackson. Because we review a summary judgment order, we remove the facts from summary judgment affidavits and deposition testimony.

Tim and Roberta Jackson owned five acres of land located on North Regal Street in Spokane. The Jacksons operated Ibex Construction on the property. L&S Tire Company leased part of the property and stockpiled mounds of old tires thereon. The acreage also functioned as a junkyard for used cars, heavy equipment, railroad box cars,

3

and other detritus. A large metal cylindrical tank filled with chlorine sat by the north fence on the property. The sealed cylinder tank had valves and displayed a tag with the word "'chemicals.'" Clerk's Papers (CP) at 252-53, 273.

Tom and Kunya Reinland own and manage Reinland Equipment Auction. Reinland Equipment Auction purchases chattel to sell at auctions.

In 2015, Tim and Roberta Jackson planned to retire and desired to neaten the junk yard on their North Regal Street property. Tim Jackson, on behalf of Ibex Construction, and Tom Reinland entered an agreement, under which Reinland purchased all chattel on the North Regal property. Before consummating the agreement, Reinland visited the Jackson property three times, although he denies walking the entire property.

On July 31, 2015, Ibex Construction signed a bill of sale that transferred to Tom Reinland "chippers, loader, tools, shop equipment, misc., [and] scrap iron" found on the Jackson land. CP at 236. Reinland paid $32,500 for the chattel. Under the agreement, Reinland could remove anything sellable from the property with few exceptions. Jackson informed Reinland not to remove equipment stored in one building and not to touch items with a green "x" thereon. Jackson never warned Reinland of any hazardous material located at the property, and Reinland never inquired about dangerous objects. Under the purchase contract, Reinland incurred no obligation to remove any objects.

Thereafter a Reinland Equipment Auction crew of Tom Reinland, Ashley Reinland, and a man only identified as Nathan spent eight days scrutinizing chattel on the

4

Jackson North Regal Street property.  The trio did not examine every object, however, nor conduct an inventory.  None of the three walked the full property.  The triad focused on shop items, railroad cars, vehicles, a loader, and chattel at the front of the land near Regal Street.

During the eight-day reconnaissance, Tom Reinland never spotted any hazardous material on the North Regal property.  He never saw the cylindrical chlorine tank that gives rise to this lawsuit.  During a deposition, Reinland testified that, if he had seen the chlorine tank or a sealed tank with a valve, he would have ordered his crew not to move the tank.  The presence of valves would have signaled to Reinland that the tank may contain an unknown substance.  According to Reinland, he would salvage a valved tank only if the valve is missing, he can see inside the cylinder, and the cylinder is empty.

Scott Sander, the owner of land lessee L&S Tire Company, knew of the presence of the chlorine tank.  According to Sander, the tank resided on the Jackson property for eighteen years.  Sander testified that he would have contacted a company that handles industrial gases before touching the tank.  He also would have read the information located on the tank's tag, although no one asked whether he saw the chemical warning or any valves on the tank when perusing the property.

Tom Reinland hired Gordon Beck, a recycler, to assist with removing salvageable scrap metal from the North Regal property.  The two agreed on a 60/40 split, 60 percent to Beck and 40 percent to Reinland, of income accrued from recycled materials.

5

Reinland informed Beck that all objects with a green "x" must remain on the property, but Beck could send for recycling all other salvageable scrap.

Gordon Beck arranged to sell the scrap on the Jackson land to Pacific Steel & Recycling. On August 12, 2015, Gordon Beck brought his excavator onto the Jackson property. Beck loaded chattel, from the yard, with the excavator onto a truck owned by Pacific and operated by Pacific employee, Don Bond. Beck loaded the chlorine tank onto the truck. According to Beck, he found the dirty chlorine tank half buried. Beck did not see any valves on the tank.

Kyle Miller, a friend of Gordon Beck, watched as Beck loaded the chlorine tank onto the Pacific truck. Miller testified that the large tank was not buried and could easily be seen by someone walking on the Jackson property. The tank rested horizontally on the land. During his deposition, Miller did not indicate whether he saw any valves or chemical warnings on the tank or whether such features could be easily seen.

Don Bond drove the Pacific Steel & Recycling truck, loaded with the chlorine tank and other objects, to Pacific's scrap facility in Spokane Valley. Bond never inspected the tank to determine if any placard or other notation identified the contents of the tank. Bond acknowledged that Pacific trained him on company safety policies and procedure. Under one policy, he must not accept sealed tanks. Under another policy, he must carefully review whether a tank is sealed. He must not allow a sealed tank to enter Pacific's scrap yard. Bond did not closely inspect the chlorine tank because he had

6

worked with Gordon Beck before and Beck had never before delivered an unsafe object to Pacific.

On arrival at Pacific Steel & Recycling's facility, Don Bond notified Pacific's scale operator that he was delivering a load of mixed iron from Gordon Beck. After weighing the truck, Bond drove toward the shear. A shear, a stationary machine, chops steel. Beck notified the Pacific crane operator, Ed Dumaw, that his truck contained mixed iron from Gordon Beck. Dumaw's duties included loading the shear with metal scrap for processing. Dumaw instructed Bond to back the truck toward the shear. Dumaw, with the crane, lifted the tank from the dump truck, rotated the tank, and placed it in the shear's hopper. Theodore Lister, Pacific's shear operator, testified that Ed Dumaw rotated the tank for the purpose of examining it for safety.

Shear operator Theodore Lister assumed that others in the chain of transporting the tank had checked the tank for safety. Lister, while sitting sixteen feet above the ground, peered down and activated the shear machine to chop the tank. The tank ruptured. Fluid burst from the tank and vaporized. Brown chlorine gas spread across the facility and inundated employees. Felix Schuck, an employee of Pacific, alleges that the gas fumes injured him. The vapors killed crane operator Ed Dumaw.

During a deposition, shear operator Theodore Lister acknowledged familiarity with a Pacific Steel & Recycling policy that required cylinder tanks to be separated from other objects, valves removed from the tank, and the tank opened before shearing. Lister

avowed that Ed Dumaw held the responsibility to separate cylinders from other material. Lister explained that cylinder tanks sometimes arrived at Pacific and he refused to shred the tanks. He identified cylinder tanks as improper for recycling due to fluid pouring from the tank or due to the item's weight. The weight could damage the shear machine. According to Lister, the Pacific driver who hauls the tank to the facility should also inspect the cylinder before hauling it.

Theodore Lister described the cylinder tank from the North Regal land as dirty, but he remembered no other features of the tank. After the spill, he saw valves on the tank. Those valves lay on the opposite end of the tank from his viewpoint as he operated the shear machine from above.

## PROCEDURE

Felix Schuck sued Roberta and Tim Jackson, Ibex Construction, Inc., Inland Northwest Equipment Auction, Inc., d/b/a Reinland Auctioneers, Reinland, Inc., d/b/a Reinland Equipment Auction, Reinland Properties, LLC, Thomas and Kunya Reinland, Ashley Reinland, and Gordon Beck. This appeal only concerns the Reinlands and their companies. We write as if Tom Reinland is the only defendant with the Reinland name, but the same analysis applies to all Reinlands and those Reinland entities on whose behalf Reinland acted.

Felix Schuck alleges that Tom Reinland knew or should have known of the presence and danger contained in the chlorine cylinder tank and should have warned

8

others of the hazardous substance in the tank. In the alternative, Reinland should have

never permitted the tank to be forwarded to Pacific Steel & Recycling for scrap

processing. Schuck asserts causes of action for common law negligence, negligence

under § 388 of the *Restatement (Second) of Torts*, negligence under § 392 of the

*Restatement (Second) of Torts*, absolute liability for engaging in an abnormally dangerous

activity under *Restatement (Second) of Torts* §§ 519 and 520, and violations of

Washington's Hazardous Waste Management Act for the failure to properly dispose of

hazardous waste.

In opposition to a summary judgment motion earlier brought by defendants

Roberta and Tim Jackson, Felix Schuck submitted a declaration from expert Enrique

Medina, a certified industrial hygienist, a certified safety professional, and an

Occupational Safety Health Administration construction outreach trainer. Medina

declared:

> It is my opinion, on a more likely than not basis, that a reasonable
> person should have known, through even minimal investigation, that there
> was potentially hazardous material in this cylinder. A reasonable person
> would have taken notice of this potential hazard. The photographs of the
> cylinder reveal a legible label on one end of the cylinder. This label clearly
> mentions the word "chemical," and there are valves on one end of the
> cylinder.

CP at 99.

Tom Reinland moved for summary judgment. Reinland argued that his conduct

did not fall within the strictures of liability created by §§ 388 and 392 of the *Restatement*

9

*(Second) of Torts*. In turn, according to Reinland, Felix Schuck cannot sustain a claim for negligence outside the confines of the *Restatement*. Reinland also argued that the handling of a chlorine gas tank does not fall within the elements established by § 520 of the *Restatement (Second) of Torts* for an abnormally dangerous activity. Finally, Reinland contended that he incurred no liability under the Hazardous Waste Management Act because he did not fit within the act's definition of "transporter" or "generator" of hazardous material.

In his response to Tom Reinland's summary judgment motion, Felix Schuck submitted an EPA Training Module, an Ohio July 2014 Hazardous Waste Generator Handbook, and Connecticut Ruling 94-40, Hazard Waste Assessment. Reinland, in turn, asked the superior court to strike the documents.

The trial court granted summary judgment dismissal of Felix Schuck's claims for absolute liability under §§ 519 and 520 of the *Restatement (Second) of Torts* and negligence under § 392 of the *Restatement*. The trial court denied summary judgment dismissal of Schuck's claim based under common law negligence, § 388 of the *Restatement*, and the Hazardous Waste Management Act. The trial court declined to rule on motions to strike evidence submitted by Schuck.

## LAW AND ANALYSIS

We granted discretionary review of all of the trial court's summary judgment decisions. On review before this court, Tom Reinland asks for reversal of the superior

10

court's denial of summary judgment on the common law negligence claim, § 388 of the

*Restatement (Second) of Torts*, and the Hazardous Waste Management Act. Reinland

also asks that we strike the declaration of one of Felix Schuck's experts and the safety

documents filed by Felix Schuck. Schuck asks for reversal of dismissal of his claims for

negligence under § 392 of the *Restatement (Second) of Torts* and for absolute liability

under §§ 519 and 520 of the *Restatement*.

Rather than addressing all of one party's assignments of error first, we address

Felix Schuck's causes of action in the order of liability for negligence under various

sections of the *Restatement*, common law negligence, absolute liability, and the

Hazardous Waste Management Act. As the superior court did, we decline to address the

admissibility of the declaration and documents.

For the first time on appeal, Felix Schuck seeks recovery under § 302 of the

*Restatement (Second) of Torts*, which creates a cause of action for negligence in general.

Because Schuck did not advance this theory of recovery below, we decline to address the

theory on review. A party may not generally raise a new argument on appeal that the

party did not present to the trial court. RAP 2.5(a); *State v. O'Hara*, 167 Wn.2d 91, 97-

98, 217 P.3d 756 (2009).

*Restatement (Second) of Torts* § 388

The Washington Supreme Court, in *Fleming v. Stoddard Wendle Motor Co.*, 70

Wn.2d 465, 467, 423 P.2d 926 (1967), adopted *Restatement (Second) of Torts* § 388

11

entitled "Chattel Known to be Dangerous for Intended Use."  Section 388 imposes

liability on those who supply chattels to others under some circumstances.  The section

declares:

> One who supplies directly or through a third person a chattel for another to use is subject to liability to those whom the supplier should expect to use the chattel with the consent of the other or to be endangered by its probable use, for physical harm caused by the use of the chattel in the manner for which and by a person for whose use it is supplied, if the supplier
> (a) knows or has reason to know that the chattel is or likely to be dangerous for the use for which it is supplied, and
> (b) has no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition, and
> (c) fails to exercise reasonable care to inform them of its dangerous condition or of the facts which make it likely to be dangerous.

In order to succeed on a claim under *Restatement (Second) of Torts* § 388, the

claimant must establish proof of all elements.  *Mele v. Turner*, 106 Wn.2d 73, 79, 720

P.2d 787 (1986).  We extract seven elements from § 388:

> 1.  Defendant, directly or through someone else, supplies a chattel for another to use.
> 2.  The defendant should expect the plaintiff to use the chattel or likely be endangered by the chattel's probable use.
> 3.  The chattel is used in the manner for which the chattel was supplied.
> 4.  The chattel is used by a person for whose use the chattel is supplied.
> 5.  The defendant knows or has reason to know that the chattel is or is likely to be dangerous for the use for which it is supplied.
> 6.  The defendant has no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition.

12

7. The defendant fails to exercise reasonable care to inform users of the chattel's dangerous condition or of the facts which render the chattel dangerous.

On appeal, Tom Reinland argues that Felix Schuck's cause of action under *Restatement (Second) of Torts* § 388 fails as a matter of law for five reasons. First, Gordon Beck's decisions and actions preclude liability against Reinland because Beck, not he, decided what to recycle. In essence, he maintains that Gordon Beck's status as a supplier disqualifies him from also being a supplier for purposes of § 388. This argument implicates element one above. Second, Reinland can incur no liability when he lacked actual knowledge that the tank existed. This position affects element four above. Third, Pacific's policies requiring inspections of delivered materials and prohibiting chopping of containers with valves or with a chemical warning excuses Reinland from liability. This contention touches element six and may implicate element two above. Fourth, the chlorine gas tank posed an obvious danger. This fourth argument also impacts element six of our seven elements above. Fifth, Reinland possessed no duty to inspect a tank merely because the tank was supplied for recycling. This final assertion concerns all elements in general and no element in particular.

Some facts support Tom Reinland's first argument based on the purported superseding conduct of Gordon Beck, but other facts weaken the argument. The facts as posited by Reinland do not constitute a defense anyway. *Restatement (Second) of Torts* § 388 declares that one may be liable for supplying a chattel through a third person. Thus,

Reinland was a supplier under the *Restatement*. Reinland contacted Gordon Beck and asked him to recycle abandoned scrap metal found on the Jackson property. He did not sell material to Beck, but entered into an agreement to unevenly share proceeds from the recycled materials. Although Reinland informed Beck not to take materials marked with a green "x," the chlorine tank lacked a green "x." Thus, Beck delivered the tank to Pacific Steel & Recycling under directions from Reinland. Although Reinland contends that he himself would not have recycled the chlorine tank, Reinland chose to rely on the judgment of Beck, with whom he had never worked before, to determine which materials to recycle. Reinland did not warn Beck of any hazardous material.

Tom Reinland, with regard to his second assertion, highlights that he lacked knowledge that the tank existed. According to Reinland, because he lacked any knowledge of the tank, he cannot be expected to provide a warning.

The supplier of the chattel, in most cases under *Restatement (Second) of Torts* § 388, knew of the existence of the chattel such that the supplier should have known of dangers posed. Also § 388 seems to address the situation when the supplier not only knows about the chattel but also knows of the danger attended to the chattel. Nevertheless, Reinland cites no decision that holds that the supplier automatically avoids liability in the unusual circumstance when he or she did not know of the existence of chattel, let alone the dangerous nature of the chattel. Perhaps liability should apply with added force in such circumstances since the supplier should investigate the presence of

objects that he owns and sends to another rather than bury his head in a sand dune as to what dangers could lurk among the chattels.

*Restatement (Second) Of Torts*, § 388, comment b, states that a supplier

is subject to liability for physical harm caused by his failure to exercise reasonable care to give to those whom he may expect to use the chattel any information as to the character and condition of the chattel which he possesses, and which *[the supplier] should recognize* as necessary to enable [the user] to realize the danger of using it.

(Emphasis added.)  This standard of reasonable care is repeated throughout the comments of § 388.  Further, as stated by our high court, one must warn of hazards which "should be known."  *Simonetta v. Viad Corp.*, 165 Wn.2d 341, 348, 197 P.3d 127 (2008).

The facts present a genuine issue of material fact as to whether Reinland had reason to know that a tank located on the property was dangerous.  Reinland bought industrial material located at the property from Tim Jackson.  Reinland did not question Jackson about any hazardous materials.  Reinland scrutinized the equipment present when he roamed the property for eleven days.  Some facts show that the large tank was not buried and could easily be seen by someone walking on the Jackson property.  The tank rested horizontally on the land.  Under these facts, a trier of fact could find that Reinland had reason to know, based on his reconnaissance of the property and the information before him, of hazardous material being among the items found in the yard. A trier of fact could also conclude, in this age of toxic waste, that the purchaser of scrap metal should question the seller of the scrap about the presence of hazardous materials.

15

Some of the language in § 388 suggests its drafters wanted suppliers or sellers of products, even layperson sellers who never touched the object, to carefully inspect the chattel before selling it. Along these lines, Felix Schuck contends that Tom Reinland should have known of the chlorine's presence and told others to either empty the tank before chopping it or warned others not to handle the tank at all. Under particular circumstances, the supplier may possess a duty to inspect the chattel. *Gall v. McDonald Industries*, 84 Wn. App. 194, 204, 926 P.2d 934 (1996). Also under some circumstances, the supplier may owe a duty not to deliver the chattel at all. *Gall v. McDonald Industries*, 84 Wn. App. 194, 204 (1996).

In support of his third contention, Tom Reinland emphasizes that Pacific Steel & Recycling's policies did not permit the recycling of a sealed tank. Therefore, according to Reinland, he could not expect the tank to be used by Pacific in its shear machine. Nevertheless, Reinland presents no evidence that he knew the tank would be sent to Pacific or that he knew about Pacific's policies. He only knew that Gordon Beck would send scrap metal to a recycler. Reinland cites no cases that support the proposition that an end user's use of the chattel in violation of the user's own policies absolves the supplier from possible liability. Because Reinland permitted Beck to recycle the material, § 388 asks whether Reinland should have provided a warning to potential users. The fact that the tank ultimately went to Pacific, which happened to have policies in place, should not relieve Reinland of liability.

16

Implied inside Tom Reinland's third contention is the notion that Pacific Steel & Recycling possessed expertise in handling scrap tanks and this expertise should shield Reinland from liability. A tire manufacturer asserted a similar argument in *Ewer v. Goodyear Tire & Rubber Co.*, 4 Wn. App. 152, 480 P.2d 260 (1971), although, in *Ewer*, the defendant was an experienced maker of chattels. Ronald Ewer mounted a tire on his employer's tractor when the tire exploded. Goodyear argued that Ewer and his employer already knew of the potential hazard of explosion. According to Goodyear, the supplier lacks a duty to warn members of a profession who know the risks involved. In response, this court ruled that a factual question arose as to the obviousness of the danger involved with the tires. This court affirmed a verdict for Ewer.

The *Ewer* decision leads to Tom Reinland's best argument—his fourth assertion that the chlorine gas tank posed an obvious danger. This argument echoes, but is not identical to, element six in our list of seven elements under § 388. The supplier is not liable unless he has no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition.

In support of his fourth argument, Tom Reinland employs the declaration of Felix Schuck's expert, Enrique Medina, against Schuck. Medina, an environmental and occupational health and safety professional, opined that "a reasonable person should have known, through even minimal investigation, that there was potentially hazardous material in this cylinder." CP at 99. According to Medina, one end of the tank included the word

17

"'chemicals.'" CP at 99. Further, the tank had valves which should have warned of the presence of a pressurized and a potential hazard.

A supplier has no duty to warn of a danger which is obvious and known. *Little v. PPG Industries, Inc.*, 92 Wn.2d 118, 123, 594 P.2d 911 (1979); *Ewer v. Goodyear Tire & Rubber Co.*, 4 Wn. App. 152, 162 (1971). Nevertheless, a factual question may arise as to the obviousness of the danger. *Ewer v. Goodyear Tire & Rubber Co.*, 4 Wn. App. 152, 162.

The rule relieving the supplier of liability for obvious dangers actually conflicts with language in *Restatement (Second) of Torts* § 388. Section 388 differentiates the form of knowledge in the supplier required for the supplier to incur liability from the nature of knowledge required in the user in order for the supplier to avoid liability. Section 388 applies if the supplier has constructive notice of the danger. In turn, § 388 does not excuse the supplier from liability if the user has constructive knowledge of the danger. Instead, the supplier avoids liability only if he lacks constructive knowledge that the end user will not gain actual knowledge of the danger. The obviousness of the danger would shield the supplier from responsibility because the user would automatically possess constructive knowledge of the danger.

Assuming the obviousness of the danger absolves the supplier of responsibility despite contrary language in § 388, we must decide whether an issue of fact exists as to the obviousness of the danger. The undisputed evidence established that the chlorine

18

tank was large, had valves to indicate it was sealed, and displayed a tag conveying that it likely contained chemicals. The Pacific Steel & Recycling truck driver, Don Bond, admits that he should have looked closely at the tank and failed to do so. Nevertheless, looking to the circumstances in which the tank was given, Bond stated that he did not look closely at the tank, as he had worked with Gordon Beck before. Bond trusted that Beck would not deliver a pressurized tank, as he had never done so in the past.

The record also shows that, during the conveyance of the tank to the shearing machine, multiple people looked at the tank. Gordon Beck used an excavator to lift the tank into Pacific's truck. Theodore Lister, the shear operator, saw the crane operator, Ed Dumaw, rotate the tank and examine it. Dumaw then placed the tank in the shear, indicating that the tank did not look dangerous. According to Lister, located sixteen feet above the ground, the tank was dirty. Once placed in the shear, Lister did not see valves on the tank, since the valves pointed away from him. None of these men, even after looking at the tank, recognized it for a hazard. Pacific processes a large volume of material. The tank was placed in a truck, not by itself, but with other materials.

A jury could eventually rule that Gordon Beck and Pacific employees should have discovered the danger attendant to the cylinder tank such that the danger was obvious. Facts support a conclusion that the cylindrical tank was obviously dangerous because of the valves and warning placard and Gordon Beck, Don Bond, Ed Dumaw, and Theodore Lister should have noticed the danger. But those same facts could lead to the opposite

conclusion that, because at least four experienced, responsible individuals missed the danger, the danger was not obvious.

Perhaps dirt adhering to the tank prevented workmen from seeing the cylindrical chlorine tank valves and chemical sticker. Perhaps all of the workers worked in haste and missed the warning signs due to their alacrity. All of these facts create a question of whether Reinland should have been concerned about transferring equipment to a third party and whether that concern should have led Reinland to closely inspect all of the chattel he intended to sell for a profit. A reasonable jury could conclude that even experienced handlers of scrap, whose employer taught them to carefully view a chattel for signs of closed valves and warning placards, may miss warnings signs such that any danger was not obvious.

One Washington decision, *Fleming v. Stoddard Wendle Motor Co.*, 70 Wn.2d 465 (1967), recognizes that experts with regard to a chattel may miss defects in the chattel. Roy Fleming sued John Triplett, among others. Fleming was injured when an employee of Stoddard Wendle Motor started a pickup and the vehicle suddenly lurched forward. Triplett, the former owner of the pickup, traded the vehicle to Stoddard Wendle Motor for another vehicle. Before the trade, Triplett modified a safety mechanism in the ignition system. He did not warn Stoddard Wendle Motor of the modification. The Supreme Court reversed summary judgment dismissal in favor of Triplett. The court concluded

that a reasonable juror could conclude that Triplett had no reason to believe that Stoddard

Wendle would realize the dangerous condition of the pickup.

Finally, in response to Felix Schuck's cause of action under *Restatement (Second)*

*of Torts* § 388, Tom Reinland declares that, pursuant to comment m to subsection (c) of §

388, he held no duty to inspect a tank merely because the tank was supplied for recycling.

Comment m to subsection (c) provides in part:

> The fact that a chattel is supplied for the use of others does not of itself impose upon the supplier a duty to make an inspection of the chattel, no matter how cursory, in order to discover whether it is fit for the use for which it is supplied. Such a duty may be imposed because of the purpose for which the chattel is to be used by those to whom it is supplied.

RESTATEMENT (SECOND) OF TORTS § 388 cmt. m.

We note that comment m explains that a duty to inspect is not imposed merely

because one supplies an item to a user. Nevertheless, the comment elaborates that a duty

may be imposed based on the intended use by the recipient of the chattel. Reinland

supplied a sealed tank for recycling, a dangerous use for a tank filled with chlorine.

Recycling entails crunching and fabricating of the tank. Under these circumstances, a

trier of fact could find that Reinland should have inspected, and, in turn, warned about the

tank or withheld the tank from delivery to Pacific.

We have reserved, for the end of discussion under § 388, the obligatory summary

judgment principles. Summary judgment should be granted if the evidence establishes

that there is no genuine issue of material fact and that the moving party is entitled to

judgment as a matter of law. CR 56(c); *Ruff v. County of King*, 125 Wn.2d 697, 703, 887 P.2d 886 (1995). To succeed on a summary judgment motion, the moving party must first show the absence of an issue of material fact. *Ingersoll v. DeBartolo, Inc.*, 123 Wn.2d 649, 654, 869 P.2d 1014 (1994). The court must construe all facts and reasonable inferences in the light most favorable to the nonmoving party. *Lybbert v. Grant County*, 141 Wn.2d 29, 34, 1 P.3d 1124 (2000). Questions of fact can be determined as a matter of law only when reasonable minds can reach but one conclusion. *Sherman v. State*, 128 Wn.2d 164, 184, 905 P.2d 355 (1995). If any genuine issue of material fact exists, the court must order a trial. *LaPlante v. State*, 85 Wn.2d 154, 158, 531 P.2d 299 (1975). We hold, based on these summary judgment rules, that a jury question exists as to Reinland's liability under *Restatement (Second) of Torts* § 388.

Section 392 of <em>Restatement (Second) of Torts</em>

We move to the second section of the *Restatement (Second) of Torts* that addresses liability of a chattel supplier. *Restatement (Second) of Torts* § 392 declares:

> One who supplies to another, directly or through a third person, a chattel to be used for the supplier's business purposes is subject to liability to those for whose use the chattel is supplied, or to those whom he should expect to be endangered by its probable use, for physical harm caused by the use of the chattel in the manner for which and by person for whose use the chattel is supplied
> (a) if the supplier fails to exercise reasonable care to make the chattel safe for the use for which it is supplied, or
> (b) if he fails to exercise reasonable care to discover its dangerous condition or character, and to inform those whom he should expect to use it.

22

We observe that *Restatement (Second) of Torts* § 388, which we previously analyzed, applies to all suppliers of chattels. § 392 is limited to supplying a chattel for business purposes. *Larner v. Torgerson*, 93 Wn.2d 801, 806, 613 P.2d 780 (1980). § 392 lacks some of the restrictions imposed by § 388 on liability. The plaintiff, suing under § 392, need not show that the supplier had no reason to believe those for whose use the chattel is supplied will realize its dangerous condition. In addition to the duty to warn of known dangers, which is imposed by § 388, § 392 also adds a duty on the supplier to make a reasonable inspection. *Larner v. Torgerson*, 93 Wn.2d 801 (1980).

If the supplier is liable under § 388, the supplier is necessarily liable under § 392. Thus, we could have avoided our visit through a muddled and puddled forest under § 388 by pegging potential liability only under § 392. But, because Felix Schuck has sued under both *Restatement* sections and has the freedom to withdraw one of the theories, we also analyzed liability under § 388.

Comment d of § 392 lists examples of uses for a supplier's business purposes and provides in part:

> In determining whether the chattel is being supplied for the supplier's business purposes, the fact that it is being used for the purpose of completing a contract or business dealing as undertaken by the supplier is often important.

23

RESTATEMENT (SECOND) OF TORTS § 392 cmt. d.  By selling and profiting from the sale of the scrap metal, including the chlorine cylinder tank, Tom Reinland fits the category of one supplying chattels for business purposes.

Tom Reinland contends that he is not liable under § 392 because he did not possess or control the chlorine tank at the time that it ruptured.  In forwarding this argument, Reinland relies on *Spaur v. Owens-Corning Fiberglas Corp.*, 510 N.W.2d 854 (Iowa 1994), in which Owens-Corning manufactured, for a power plant, insulation materials containing asbestos.  Robert Spaur worked at the plant for twenty-five years and, in October of 1990, he was diagnosed with mesothelioma, a lung cancer caused by asbestos.  Beginning in 1963, Spaur was often exposed to asbestos dust from the insulation manufactured by Owens-Corning.  Owens-Corning argued that the four suppliers who supplied to and installed its products at the plant faced liability under § 392, but not it.  The court rejected the contention, stating:

> the supplier must have an interest in the consumer's use of the product and this must be a continuing business interest.  "The term 'business purpose' of the supplier . . . does not continue after possession or control of the chattel has been transferred to someone else."  Following the insulation work at the plant, these suppliers had no further business interest in the use of the products themselves.

*Spaur v. Owens-Corning Fiberglas Corp.*, 510 N.W.2d at 864 (alteration in original) (citations omitted).

24

Tom Reinland also relies on *Bloemker v. Detroit Diesel Corp.*, 720 N.E.2d 753 (Ind. App. 1999) to argue that a "chattel owner" is not liable under § 392 if he does not maintain possession or control over the chattel *at the time of an incident*. Bob Bloemker modified a housing cover pattern and, during this process, the pattern exploded causing Bloemker to lose his right arm. A subsequent inspection revealed that the pattern had a sealed cavity that was not adequately vented to permit for the removal of sand and moisture. The mixture expanded and caused the explosion. The original manufacturer of the pattern was unknown. The defendant, Detroit Diesel Corporation, who owned the pattern, did not retain it nor request a modification. Bloemker sued Detroit Diesel pursuant to § 392. The Court of Appeals held "Detroit Diesel is merely a technical owner of the pattern, and never possessed nor maintained control over the pattern, [and thus] Detroit Diesel cannot be classified as a supplier under either § 388 or § 392." *Bloemker v. Detroit Diesel Corp.*, 720 N.E.2d at 761.

Tom Reinland misapprehends the two cited cases. In *Spaur v. Owens-Corning Fiberglas Corp.*, the court focused on whether the suppliers had a continued business interest in the chattel, which the court determined they did not. In *Bloemker v. Detroit Diesel Corp.*, no liability existed because Detroit Diesel was an owner in name only and had never possessed or controlled the chattel.

In *Larner v. Torgerson*, 93 Wn.2d 801, 807 (1980), our high court noted that the duty to make a reasonable inspection under § 392 "arises at the time that the supplier

25

transfers possession and control of the chattel." Mark Larner sustained an injury after Torgerson Corporation leased a forklift to his employer, Glandon Machinery Company. Torgerson leased the forklift so that Glandon could load and unload Torgerson equipment that needed to be serviced by Glandon. Glandon stored the forklift for many months, and the forklift later developed an electrical defect. Our high court determined that Torgerson owed no duty because "it is undisputed that the defect did not exist at the time that Torgerson transferred possession and control of the forklift to Glandon." *Larner v. Torgerson*, 93 Wn.2d at 807.

The chlorine cylinder tank posed dangers when Tom Reinland owned the tank and when he directed Gordon Beck to transfer the tank on Reinland's behalf. Thus, the foreign and Washington decisions lack relevance.

Tom Reinland entered an agreement with Gordon Beck, under which agreement Beck chose the materials to transfer for recycling. Reinland did not sell the material to Beck, but rather arranged to receive forty percent of the proceeds from recycled materials. Thus, Reinland retained ownership and a business interest in the chlorine cylinder tank through its delivery to Pacific Steel & Recycling. To repeat, *Restatement (Second) Of Torts* § 392 imposes liability on "One who supplies to another, directly or through a third person, a chattel. . . ."

26

Common Law Negligence Claims

Tom Reinland contends that Felix Schuck's claims under the *Restatement (Second) of Torts* subsume any claim under the common law outside the confines of the *Restatement*. We agree.

When Washington courts adopt sections of the *Restatement*, the standard stated therein constitutes the standard under the common law. *Afoa v. Port of Seattle*, 191 Wn.2d 110, 136, 421 P.3d 903 (2018); *City of Tacoma v. Tacoma News, Inc.*, 65 Wn. App. 140, 146, 827 P.2d 1094 (1992). In *Lunt v. Mountain Spokane Skiing Corp.*, 62 Wn. App. 353, 358, 814 P.2d 1189 (1991), this court wrote:

> Washington adopted Restatement (Second) of Torts § 388 in *Fleming v. Stoddard Wendle Motor Co.*, 70 [Wn].2d 465, 423 P.2d 926 (1967). *Fleming* held that section 388 established the duty of chattel vendors and others irrespective of whether the chattel they supplied was made by them or a third person.

Felix Schuck presents no argument, let alone case law, that he may forward a negligence claim independent of the *Restatement*. We reverse the superior court's refusal to dismiss any such independent claim.

Absolute Liability under *Restatement* §§ 519 and 520 for Abnormally Dangerous Activity

Felix Schuck contends that the trial court erred when dismissing his claim for absolute liability for an abnormally dangerous activity under *Restatement (Second) of Torts* §§ 519 and 520. Schuck contends that Tom Reinland engaged in an abnormally

dangerous activity when he recycled the chlorine tank. Tom Reinland rejects absolute liability by emphasizing that the storage and transportation of chlorine can be made reasonably safe, an important factor the court considers when determining whether an activity is abnormally dangerous and qualifies for absolute liability.

Although the parties use the term "strict liability" in the context of liability without fault, we employ the term "absolute liability." Strict liability and absolute liability are distinct concepts. *Perez v. Southern Pacific Transportation Co.*, 180 Ariz. 187, 883 P.2d 424, 425 (Ct. App. 1993). Strict liability, used in the context of a products liability suit, loosens the negligence standard and allows recovery if a reasonable consumer would deem the product to be harmful or to carry inadequate warnings, despite the claimant failing to show that the product manufacturer or supplier was negligent. In the absolute liability setting, the injured claimant automatically prevails by merely showing the defendant engaged in an abnormally dangerous activity under the *Restatement (Second) of Torts*.

The Washington high court adopted §§ 519 and 520 of the *Restatement (Second) of Torts* in *Klein v. Pyrodyne Corp.*, 117 Wn.2d 1, 7, 810 P.2d 917, 817 P.2d 1359 (1991). Pursuant to § 519, one is liable for carrying on an abnormally dangerous activity when the activity causes injury.

> (1) One who carries on an abnormally dangerous activity is subject to liability for harm to the person, land or chattels of another resulting from the activity, although he has exercised the utmost care to prevent the harm.

28

(2) This strict liability is limited to the kind of harm, the possibility
of which makes the activity abnormally dangerous.

Section 520 does not present an independent basis for liability against a defendant, but

rather lists six factors for consideration when assessing whether the defendant engaged in

an abnormally dangerous activity for purposes of liability under § 519:

(a) existence of a high degree of risk of some harm to the person,
land or chattels of others;
(b) likelihood that the harm that results from it will be great;
(c) inability to eliminate the risk by the exercise of reasonable care;
(d) extent to which the activity is not a matter of common usage;
(e) inappropriateness of the activity to the place where it is carried
on; and
(f) extent to which its value to the community is outweighed by its
dangerous attributes.

The circumstances of this appeal raise numerous subquestions with regard to the

overarching question of whether to impose absolute liability on Tom Reinland.  First, in

what activity did Tom Reinland engage?  Second, can one incur absolute liability for an

abnormally dangerous activity when one does not know he engaged in the activity or at

least did not know of one of the features that rendered the activity abnormally dangerous?

Third, should absolute liability against Tom Reinland be withheld because of the

intervening conduct of Gordon Beck and Pacific Steel & Recycling?  Fourth, did Tom

Reinland engage in an abnormally dangerous activity?  Fifth, should this court decide as

a matter of law whether absolute liability applies or does not apply against Tom

Reinland? Conversely, should this court allow a jury to decide liability for this claim because of issues of fact? We address those questions in such order.

The law imposes absolute liability, in some circumstances, for four reasons. First, the defendant's activity destroyed evidence such that the plaintiff cannot prove negligence. *Siegler v. Kuhlman*, 81 Wn.2d 448, 502 P.2d 1181 (1972). Second, the law wishes to promote safer methods of engaging in the activity or to switch the location of the activity to a safer situs. Thus, contrary to the dissent's position, the law assumes and hopes that actors can reduce the risk of abnormally dangerous activity. Third, the law desires to levy the cost of the harm resulting from the activity on that activity. *Klein v. Pyrodyne Corp.*, 117 Wn.2d 1, 11 (1991). Fourth, the law desires to recompense the most innocent party. *Klein v. Pyrodyne Corp.*, 117 Wn.2d 1, 11 (1991). We contemplate these purposes as we answer our subquestions.

*The Activity*

In analyzing absolute liability under the *Restatement (Second) of Torts*, a court must identify the activity in which the defendant engaged. The identity given to the activity could determine the outcome of whether the court imposes absolute liability.

On the one hand, Tom Reinland isolates his activity as selecting items to sell at auction, not his recycling the tank. In the alternative, Reinland identifies the activity, in which he engaged, as the handling of a chlorine cylinder tank in the abstract. He does not wish to encumber this abstract activity with the particulars of his case. Broadly defining

the activity could assist Reinland in avoiding liability because he can then argue that handling a cylindrical tank or handling chlorine is commonplace and can be easily performed without danger to others.

On the other hand, Felix Schuck identifies Tom Reinland's pertinent activity as transferring a pressurized chlorine gas tank with chlorine inside for recycling, which included chopping the tank. By adding these details to the handling of the chlorine tank owned by Reinland, Schuck improves his chances of establishing absolute liability. According to Schuck, no matter the care exercised, the sending of a cylindrical tank containing chlorine gas to be processed into scrap metal cannot eliminate the high risk inherent in disposing of chlorine gas.

Few, if any decisions, expressly define the activity identified by the court for purposes of analyzing absolute liability. Likewise, few, if any decisions, list all of the facts considered by the court when isolating the relevant activity.

The dissent relies on *Hurley v. Port Blakely Tree Farms LP*, 182 Wn. App. 753, 332 P.3d 469 (2014), in which property owners brought action against logging companies, alleging absolute liability, trespass, nuisance, and negligence stemming from landslides that damaged property. On appeal to another division of this court, the claimants challenged the trial court's dismissal on summary judgment of the claim for absolute liability. The property owners urged the Court of Appeals to define the activity subject to strict liability as clearcutting on steep, unstable slopes directly above a

residential area. This court refused. This court wrote that Washington and foreign cases define the activity broadly and then consider the nature of the locality where the activity is conducted in determining whether the risk of harm is high. The court rejected absolute liability in part because landslides were endemic to the locality, the claimants' homes were built on an alluvial fan consisting of sediments derived from landslides and debris flows over many years, and hundreds of landslides throughout Western Washington occurred on the same day.

When writing that Washington and other courts define the activity broadly, this court, in *Hurley v. Port Blakely Tree Farms LP*, cited no foreign decisions and five Washington decisions: *Langan v. Valicopters, Inc.*, 88 Wn.2d 855 (1977) (crop dusting); *Erickson Paving Co. v. Yardley Drilling Co.*, 7 Wn. App. 681, 502 P.2d 334 (1972) (blasting); *Vern J. Oja & Associates v. Washington Park Towers, Inc.*, 89 Wn.2d 72, 569 P.2d 1141 (1977) (pile driving); *Siegler v. Kuhlman*, 81 Wn.2d 448 (1972) (transporting gas as freight by truck); and *Klein v. Pyrodyne Corp.*, 117 Wn.2d 1 (1991) (fireworks displays). Nevertheless, the courts in none of the Washington decisions wrote or hinted that the germane activity should be broadly defined. None of the decisions analyzed how a court should proceed to define the activity. Except in *Siegler v. Kuhlman*, the courts addressed activities readily, historically, and universally viewed as abnormally dangerous. *Siegler v. Kuhlman*, as discussed later, supports the position that

the court should narrowly define the activity based on those factors that created the danger.

In short, we find no principles from Washington cases to assist in isolating the activity for purposes of determining absolute liability. Some principles from foreign decisions may conflict with our identification of the activity.

According to one foreign decision, for absolute liability purposes, the danger cannot be predicated on mere causal or collateral negligence of others with respect to the activity under the particular circumstances. *Arlington Forest Associates v. Exxon Corp.*, 774 F. Supp. 387, 392 (E.D. Va. 1991). Presumably, under this rule, the court should not consider the negligent conduct of others participating in the activity. This principle cuts both ways. The rule could be used as vindication for Tom Reinland in that, if we eliminate any negligence of Gordon Beck and employees of Pacific Steel & Recycling, the accident would not have happened. Or the rule could be read to stop us from shielding Reinland from liability for sending a tank filled with a dangerous substance to another for recycling because we should not excuse Reinland for his dangerous activity because of unreasonable conduct of other actors because that conduct is irrelevant for purposes of determining absolute liability.

According to the same foreign decision, we cannot so concretely identify the activity as to invoke strict liability for all negligently conducted activity. *Arlington Forest Associates v. Exxon Corp.*, 774 F. Supp. 387, 392 (E.D. Va. 1991). Performing a

dangerous activity in a negligent manner cannot be made safe except by ceasing to behave negligently. *Arlington Forest Associates v. Exxon Corp.*, 774 F. Supp. 387, 392 (E.D. Va. 1991). These related principles suggest that, if the defendant is negligent, the court should not impose absolute liability. Under such a rule, Tom Reinland would be absolved from absolute liability because the burst of chlorine resulted from his negligent failure to inspect the tank, and, if he had scrutinized the tank, the danger posed by the activity would have been nullified. Of course, such a rule assumes Reinland acted negligently. Regardless, no decision precludes a plaintiff from suing both in negligence and absolute liability. Sections 519 and 520 of the *Restatement (Second) of Torts* do not preclude absolute liability when the defendant's conduct also constituted negligence.

Consistent with the *Arlington Forest* suggested rule, the dissent may criticize our analysis because we purportedly impose absolute liability on Tom Reinland by incorporating his negligent conduct. Dissent at 2. Of course, this criticism assumes that Reinland behaved negligently, but the dissent does not mention whether Reinland acted negligently. Reinland has not been found negligent. Reinland denies any negligent conduct. I suspect that Felix Schuck would forgo a claim of absolute liability, if Tom Reinland agreed he acted negligently, especially because of the lack of any comparable fault on the part of Schuck. We will not know if Tom Reinland was negligent until after a jury verdict on this theory of liability. Then it would be too late for Schuck to assert a claim of absolute liability. The claimant should not be placed in jeopardy of losing on

liability by dismissing an absolute liability cause of action because the defendant may have acted negligently, when the defendant denies negligence. Furthermore, an injured party should not be tasked with convincing a jury of negligence, when the *Restatement (Second) of Torts* commands absolute liability.

Because we find no principles from Washington cases to assist in isolating the activity, we rely on a principal Washington decision, *Siegler v. Kuhlman*, 81 Wn.2d 448 (1972), an opinion on which we also rely when answering other subquestions. In *Siegler v. Kuhlman*, seventeen-year-old Carol House died in the flames of a gasoline explosion when the car she drove encountered a pool of gasoline spilling from a fuel tanker and trailer. The Washington Supreme Court did not identify the "activity," for purposes of engaging in an abnormally dangerous activity, as some ill defined or theoretical carriage of fuel. When imposing absolute liability on the truck driver and his employer, the high court instead emphasized the many details of the case. Those details included the transport of 3,800 gallons of gasoline in the truck tank, 4,800 gallons of gasoline in the trailer tank attached to the truck, and transportation of a volatile and flammable substance on a busy public highway.

*Ashland Oil, Inc. v. Miller Oil Purchasing Co.*, 678 F.2d 1293 (5th Cir. 1982) also holds resemblances to Felix Schuck's suit because the defendant sought to dispose of hazardous chemicals by injecting them into a gasoline pipeline. The court did not deem the relevant activity to be the disposal of hazardous chemicals in the abstract. Instead the

court identified the activity as disposing of industrial waste by introducing it into commerce and a pipeline. The court held the defendant to have engaged in an abnormally dangerous activity.

Based on *Siegler v. Kuhlman* and *Ashland Oil, Inc. v. Miller Oil Purchasing Co.*, we incorporate some of the details of Tom Reinland's conduct when defining his activity for purposes of determining whether he participated in an abnormally dangerous activity. We identify Reinland's relevant activity as directing the transport of a cylinder tank containing chlorine to a busy business for recycling, which recycling would include placing the tank in a shear machine. In identifying Reinland's activity as such, we note that recycling nearly always entails some chopping, crushing, melting, or other change in the structure of metal.

By so identifying the activity of Tom Reinland, we conclude that, if someone is to be held liable for an abnormally dangerous activity, the court should focus on all of those factors that render the activity dangerous. By so identifying the activity, we also serve three of the four purposes behind absolute liability for an abnormally dangerous activity. Reinland engaged in a business pursuit from which he expected income. Our definition of his activity imposes the cost of the harm resulting from his conduct on the activity. Felix Schuck was an innocent bystander. By imposing liability on Reinland, we encourage others engaged in handling scrap to adopt safer methods of conduct, such as thoroughly examining the scrap before sending the metal for recycling.

36

The dissent suggests that we incorporate "unintended consequences" or "unintended results" when defining the relevant activity. Dissent at 2-4. The dissent identifies those unintended results as placing a pressurized chlorine tank in a shearing machine. The dissent cites no law for the proposition that the court should not consider unintended results when delineating the activity. We have already discussed that Tom Reinland knew materials sent to Pacific would be processed as scrap, which processing would alter the structure of any tank. More importantly in our analysis, every time a party engages in an abnormally dangerous activity that imposes absolute liability, some unintended consequences follow, those consequences being unwanted damage to property or unpremeditated injury or death to a person. Declining liability when unintended consequences arise would preclude absolute liability in all circumstances.

*Knowledge of the Activity and Its Dangerousness*

We remind the reader that, although he knowingly directed that scrap metal be sent for recycling, Tom Reinland lacked knowledge that he sent a chlorine cylinder tank to Pacific Steel & Recycling. Nevertheless, we find no case that addresses whether the defendant must know he engaged in an ultrahazardous activity or intentionally created a high risk of harm in order to incur liability.

As already mentioned, *Restatement (Second) of Torts* § 519 imposes absolute liability on one engaged in an abnormally dangerous activity, while § 520 lists factors to balance when assessing whether one engages in an abnormally dangerous activity.

37

Neither of the two *Restatement* sections requires the defendant to know that he engaged

in the activity or know of the existence of a fact that renders the activity abnormally

dangerous. The *Restatement* mentions no mens rea. If the drafters of the Restatement

intended to require knowing or intentional conduct, the drafters could have expressed this

requirement.

In *In re Hanford Nuclear Reservation Litigation*, 350 F. Supp. 2d 871 (E.D. Wash.

2004), individuals claimed government contractors, DuPont and General Electric,

exposed them to radioactive emissions from a federal nuclear facility used to produce

plutonium for atomic weapons. The chemical separation that occurred in the Hanford

plutonium production process created radioactive I–131 that was released into the air

by DuPont and General Electric. The exposure allegedly caused thyroid cancer and

hypo-thyroidism. The contractor's contested absolute liability, in part, on the basis that,

at the time, they had no knowledge that I–131 caused the diseases. The court answered

that the *Restatement (Second) of Torts* and Washington cases fail to establish such a

requirement.

Admittedly, DuPont and General Electric, unlike Tom Reinland, knew they

handled a risky substance. Nevertheless, the two government contractors did not know

the full extent of the risk or the type of harm that could follow from the handling of the

substance. To repeat for purposes of Tom Reinland's appeal, neither the *Restatement* nor

Washington case law require knowledge that one is transporting a dangerous substance in order to qualify for absolute liability.

*Restatement (Third) of Torts* § 20, cmt. i (Am. Law Inst. 2009) reads that the court should not impose absolute liability on the actor unless he possesses actual or constructive knowledge of the riskiness of the activity. Washington has not adopted *Restatement (Third) of Torts*. Anyway, many facts support a finding that Tom Reinland should have known of the danger lurking in the cylinder tank.

Sound reason supports imposing absolute liability for an abnormally dangerous activity when the defendant lacks knowledge of the dangerous substance he handles. Reinland should not evade responsibility by failing to investigate the nature of the objects he sent for recycling. Despite reviewing the site of the scrap metal over eleven days, Reinland failed to see what he could have noticed. Reinland sought to gain income by the recycling of the tank. The better rule is to impose, on the one sending chattels for recycling, a duty to investigate the nature of the chattels or to warn the user that he lacks knowledge of the substance of the chattels and knowledge of any of the dangerous qualities of any of the chattels.

*Intervening Conduct of Others*

As he does in response to other theories of liability asserted by Felix Schuck, Tom Reinland contends that he did not send the cylindrical chlorine tank to Pacific Steel & Recycling. He blames this activity on Gordon Beck. Reinland also posits that, since

39

Pacific should have noticed the danger created by the tank, he avoids absolute liability. We disagree with both contentions.

Intervening acts of third persons serve to relieve the defendant from strict liability for abnormally dangerous activities only if those acts were unforeseeable in relation to the extraordinary risk created by the activity. *Klein v. Pyrodyne Corp.*, 117 Wn.2d 1, 17 (1991). This limited rule of absolution encourages those who conduct abnormally dangerous activities to anticipate and take precautions against the possible negligence of third persons. *Klein v. Pyrodyne Corp.*, 117 Wn.2d 1, 17 (1991). Even when the third person's negligence is beyond the actor's control, the law imposes strict liability if the third person's negligence was reasonably foreseeable. *Klein v. Pyrodyne Corp.*, 117 Wn.2d at 17. Such a result allocates the economic burden of injuries arising from the foreseeable negligence of third persons to the party best able to plan for it and to bear it— the actor carrying on the abnormally dangerous activity. *Klein v. Pyrodyne Corp.*, 117 Wn.2d at 17.

Tom Reinland entered into a contract with Gordon Beck, under which agreement Beck acted as an agent for Reinland and himself in delivering scrap metal for recycling. Reinland identified the objects that Beck should deliver, and those objects included the cylindrical chlorine tank. Or at least Reinland did not exclude the tank from the recycling project. Reinland expected financial gain by the selling of the scrap to Pacific Steel & Recycling. Reinland owned the tank, and he had the tank in his possession longer than

other actors in the tragedy. He possessed the most time to investigate the safety of the tank.

Tom Reinland does not expressly argue that the chopping of the cylindrical tank or the spewing of the chlorine was unforeseeable given the circumstances of the case. Reinland did not know of any policies of Pacific Steel & Recycling that could have or would have prevented the catastrophe. Regardless of the policies of the end user, Reinland should have recognized the possibility of danger to others. Reinland should have considered the possibility that Beck and Pacific Steel's employees, in the rush of business, would fail to notice the nature of the tank. Because of the danger of chlorine and its containment in an old tank, accidents with the cylindrical chlorine tank could have happened that resulted in a loosened valve or piercing of the tank's structure before the tank reached Pacific Steels' shear machine.

The dissent writes that our analysis incorporates negligent conduct of others. The dissent in fact already concludes that others acted negligently. Nevertheless, the dissent does not identify whose negligence we incorporate. The dissent may refer to conduct of Gordon Beck or employees other than Felix Schuck of Pacific Steel. Of course, Pacific Steel and its employees enjoy immunity under worker compensation law, but the company and its employees have not been found negligent. More importantly, in line with our analysis of possible negligence of Tom Reinland, Beck denies negligence. We will not know if Beck was negligent until after a jury verdict on this theory of liability.

Felix Schuck might forgo a claim of absolute liability, if Gordon Beck agreed he acted

negligently.

*Abnormally Dangerous Activity*

Now that we have identified the activity in which Tom Reinland engaged and

answered two other questions, we arrive at the heart of the appeal. We must assess

whether Tom Reinland's activity qualifies as an abnormally dangerous activity. We

repeat the six factors listed by *Restatement (Second) of Torts* § 520 for consideration

when assessing whether a defendant engaged in an abnormally dangerous activity for

purposes of absolute liability:

> (a) existence of a high degree of risk of some harm to the person,
> land or chattels of others;
> (b) likelihood that the harm that results from it will be great;
> (c) inability to eliminate the risk by the exercise of reasonable care;
> (d) extent to which the activity is not a matter of common usage;
> (e) inappropriateness of the activity to the place where it is carried
> on; and
> (f) extent to which its value to the community is outweighed by its
> dangerous attributes

Comment f to § 520 assists in analyzing § 520's six factors:

> Any one of them is not necessarily sufficient of itself in a particular
> case, and ordinarily several of them will be required for strict liability. On
> the other hand, it is not necessary that each of them be present, especially if
> others weigh heavily. Because of the interplay of these various factors, it is
> not possible to reduce abnormally dangerous activities to any definition.
> *The essential question is whether the risk created is so unusual, either*
> *because of its magnitude or because of the circumstances surrounding it, as*
> *to justify the imposition of strict liability for the harm that results from it,*
> *even though it is carried on with all reasonable care.* In other words, are its

42

dangers and inappropriateness for the locality so great that, despite any usefulness it may have for the community, it should be required as a matter of law to pay for any harm it causes, without the need of a finding of negligence.

(Emphasis added.)

The six factors from § 520 are necessarily fact specific. *Valentine v. Pioneer Chlor Alkali Co.*, 109 Nev. 1107, 864 P.2d 295, 297 (1993). Despite no factor being necessary or sufficient, at least one factor among (a), (b), and (c) must generally be present, and at least one factor among (d), (e), and (f) must also be present. *Stout v. Warren*, 176 Wn.2d 263, 271, 290 P.3d 972 (2012); *Klein v. Pyrodyne Corp.*, 117 Wn.2d 1, 8-9 (1991). This rule suggests that, in some situations, fulfillment of only two of the factors can lead to absolute liability. The party asserting that an activity is abnormally dangerous holds the burden to establish a factual basis for that conclusion. *Stout v. Warren*, 176 Wn.2d 263, 271 (2012). We analyze the six factors, beginning with a high degree of risk of harm.

Factors (a) and (b)

The law recognizes some substances as inherently dangerous. Poisonous or dangerous drugs, as well as dangerous chemicals, are familiar examples of substances recognized as inherently dangerous. *Kajiya v. Department of Water Supply*, 2 Haw. App. 221, 629 P.2d 635, 639 (1981).

Chlorine, a toxic gas, used as a disinfecting agent in water purification, as an ingredient in cleansing products, and as a constituent in pesticides, falls within the category of an inherently dangerous substance. *Kajiya v. Department of Water Supply*, 629 P.2d 635, 639 (Haw. Ct. App. 1981). Chlorine is a toxic gas that attacks the human respiratory system, eyes, and skin. Belligerents have employed chlorine gas as a chemical weapon beginning with World War I and as recently as Iraq in 2007 and Syria in 2018. The danger of the chemical increases in confined spaces. Because the element is denser than air, the gas accumulates at the bottom of poorly ventilated spaces.

Thirty parts per million (ppm) of chlorine gas causes coughing and vomiting, and sixty parts causes lung damage. 1000 ppm can be fatal after a few deep breaths of the gas. The Occupational Safety and Health Administration has set the permissible exposure limit at a workplace for elemental chlorine at 1 ppm.

We conclude that, under the first factor of § 520, the handling of chlorine poses a high degree of risk to persons because of the danger of the chemical. Under the second factor, exposure to the chlorine will cause great harm, if not death.

We recognize that the presence of chlorine or any other abnormally dangerous substance does not automatically give rise to absolute liability. *Valentine v. Pioneer Chlor Alkali Co.*, 864 P.2d 295 (1993). The law does not impose liability on abnormally dangerous substances, but on abnormally dangerous activity. Thus, in analyzing the dangerousness of an activity, the properties of the particular substance involved do not

44

control, rather the court examines the defendant's activity as a whole. *Perez v. Southern Pacific Transportation Co.*, 883 P.2d 424, 426 (Ct. App. 1993). Still, Tom Reinland's sending of the cylindrical chlorine tank for recycling constituted an abnormally dangerous activity.

Factor (c)

We now focus on element three or factor (c) of § 520—the inability to eliminate the risk by the exercise of reasonable care. Tom Reinland focuses solely on this factor. As to factor (c), the phrase "the risk" refers to the "high degree of risk" mentioned in factor (a). *New Meadows Holding Co. v. Washington Water Power Co.*, 102 Wn.2d 495, 501, 687 P.2d 212 (1984). Thus, factor (c) addresses itself to the question of whether, through the exercise of ordinary care, the risk inherent in an activity can be reduced to the point where it can no longer be characterized as a "high degree of risk." *New Meadows Holding Co. v. Washington Water Power Co.*, 102 Wn.2d 495, 501 (1984).

Absolute liability applies only to such harm as results from a risk which, being incapable of elimination by the utmost precaution, care and skill, makes the activity ultrahazardous. RESTATEMENT (SECOND) OF TORTS § 519 cmt. b9. *Restatement (Second) Of Torts* § 520 cmt. h reflects on clause (c) of § 520:

> Another important factor to be taken into account in determining whether the activity is abnormally dangerous is the impossibility of eliminating the risk by the exercise of reasonable care. Most ordinary activities can be made entirely safe by the taking of all reasonable

precautions; and when safety cannot be attained by the exercise of due care there is reason to regard the danger as an abnormal one.

Although the *Restatement* instructs courts to consider each factor, the question of whether reasonable care can eliminate the high degree of risk is often central to the determination of whether an activity is abnormally dangerous. *Apodaca v. AAA Gas Co.*, 2003-NMCA-085, 134 N.M. 77, 73 P.3d 215, 225 (2003). Generally, the inability to eliminate the risks by taking precautions distinguishes absolute liability from negligence. *Apodaca v. AAA Gas Co.*, 73 P.3d 215, 225 (N.M. Ct. App. 2003).

The elimination of any and all risks is impossible in most, if not all, cases. *Apodaca v. AAA Gas Co.*, 73 P.3d 215, 225 (N.M. Ct. App. 2003). The plaintiff need not prove that no conceivable precautions or care could eliminate the risk for factor (c) to apply. *In re Hanford Nuclear Reservation Litigation*, 350 F. Supp. 2d 871, 880 (E.D. Wash. 2004).

Tom Reinland contends that precautionary steps could have prevented the catastrophic release of the chlorine gas. According to Reinland, chlorine gas is often used or moved without any incident. Also, according to Reinland, when salvaging a chlorine cylinder tank for scrap, the tank can be rendered safe from serious harm by the exercise of utmost care. One can empty the tank and one can open the valves.

For help in determining when an activity's risk can be sufficiently eliminated, we return to our principal case, *Siegler v. Kuhlman*, 81 Wn.2d 448 (1972). The Supreme

Court concluded that the hauling of gasoline as freight on a public highway takes on uniquely hazardous characteristics. The hazards inhering from the size of the load, its bulk or quantity and its movement along the highways presented a reason for application of absolute liability because even with due care those hazards could not be eliminated.

*New Meadows Holding Co. v. Washington Water Power Co.*, 102 Wn.2d 495 (1984), has a different outcome from *Siegler v. Kuhlman*. In *New Meadows*, the Washington Supreme Court analyzed whether the use of underground transmission lines for natural gas constituted an abnormally dangerous activity. When analyzing factor (c), the Supreme Court concluded that some degree of risk of natural gas pipeline leaks will always be present. Nevertheless, the risk could be eliminated by the use of reasonable care with regard to the dangerous character of the commodity. The Supreme Court emphasized strict federal and state safety regulations controlled natural gas companies. Natural gas distributors engaged in programs for corrosion control, pipeline testing, gas leak investigation, and awareness of construction work near gas company facilities. As to factors other than factor (c), the court noted that underground lines for natural gas are ubiquitous and 160 million people, in 1984, used gas for residential needs.

Tom Reinland provides no information as to regulations concerning the handling of chlorine or concerning recycling metals. Felix Schuck contends the safety rules found in the Hazardous Waste Management Act apply to Reinland's handling and disposal of

47

the chlorine. Reinland argues to the contrary. Reinland presents no data concerning safety programs with regard to chlorine. The presence of chlorine tanks is not ubiquitous.

The casual, if not astute, reader may consider the decision in *New Meadows Holding Co. v. Washington Water Power Co.* contrary to the Supreme Court's ruling in *Siegler v. Kuhlman*. Nevertheless, the *New Meadows Holding* court distinguished the earlier decision by commenting that the underground transmission of natural gas significantly differed from the relevant activity in *Siegler*. Natural gas flows through a small two-inch pipe, buried underground and away from the dangers of the surface world. The underground pipes encounter no careless drivers, faulty brakes, or slippery roads. The heightened danger resulting from the storage of a highly volatile substance in large commercial quantities, rolling at high speed on a well-traveled highway, was also absent. The Washington Supreme Court's distinctions rendered, in *New Meadows Holding Co. v. Washington Water Power Co.*, from the significant facts in *Siegler v. Kuhlman* weigh heavily in favor of absolute liability against Tom Reinland.

Tom Reinland particularly relies on *Erbrich Products Co. v. Wills*, 509 N.E.2d 850 (Ind. Ct. App. 1987) because the case concerns the release of chlorine gas. As a result of chlorine gas escaping into the atmosphere, nearby neighbors suffered eye and nasal passage irritation, nausea, headaches, and vomiting. Nearby property sustained torched grass and gardens.

The Indiana appeals court, in *Erbrich Products Co. v. Wills*, recognized that chlorine gas, in its natural state, is poisonous and inherently dangerous. The court, nonetheless, ruled that the manufacture of chlorine bleach is not an abnormally dangerous activity because the activity can be made safe by the exercise of reasonable care.

*Fritz v. E.I. Du Pont De Nemours & Co.*, 45 Del. 427, 75 A.2d 256 (Super. Ct. 1950) has a similar result as *Erbrich Products Co. v. Wills*. Peter Fritz sued as the result of the release of chlorine gas from a DuPont manufacturing facility. Fritz argued that the possession and use by DuPont of chlorine gas constituted such a hazardous activity that DuPont could have reasonably foreseen that certain harm would result to any person within the area of operation in the event the chlorine gas should escape. The Delaware court concluded that DuPont, the principal employer in Delaware, could safely store the chlorine, despite the incident. The court worried about strangling a company with liability if the company became an insurer in the event of injury resulting from the release of substances from its premises.

The Nevada court, in *Valentine v. Pioneer Chlor Alkali Co.*, 864 P.2d 295 (1993), reached a different conclusion than the foreign courts in *Erbrich Products Co. v. Wills* and *Fritz v. E.I. Du Pont De Nemours & Co*. The Nevada Supreme Court refused, because of sparse facts, to answer a certified question from the United States District Court regarding absolute liability for the release of chlorine. The court, however, deemed

chlorine to be dangerous and release of the substance could be an abnormally dangerous activity that could lead to absolute liability.

For purposes of factor (c), we notice parallels between the two tragedies of Carol House in *Siegler v. Kuhlman*, on the one hand, and Felix Schuck and his coworkers, on the other hand. Tom Reinland arranged for the transport of a volatile and extremely dangerous substance to a place where many others would be present. Once Gordon Beck placed the cylindrical tank on Pacific's truck, many factors outside the control of Reinland could have led to a catastrophe. *Erbrich Products Co. v. Wills*, Reinland's principal decision, and *Fritz v. E.I. Du Pont De Nemours & Co.* involved the storage of chlorine, not the transportation of chlorine gas or the chopping of a chlorine tank.

We previously addressed Tom Reinland's lack of knowledge that one of the chattels he purchased and sold for scrap was a tank containing chlorine, but we discussed this factor in the context of whether the lack of actual knowledge should excuse Reinland from absolute liability. We did not discuss whether Reinland's lack of knowledge should be a factor included in our identification of Reinland's activity or whether the lack of knowledge impeded the ability to eliminate the risk by the exercise of reasonable care and thereby justify imposing absolute liability.

We reach no definitive conclusion as to whether the exercise of due care can reduce the inherent risk of sending a chlorine tank for recycling to an acceptable level of risk. But we question Tom Reinland's insistence that the risk can be significantly

lowered particularly when the owner of the chattel fails to warn users or buyers of the chattel of the dangers lurking inside because the owner lacks knowledge of those dangers.

The dissent emphasizes this court's ruling in *Schuck v. Beck*, No. 36754-1-III (Wash. Ct. App. Apr. 21, 2020) (unpublished) *(Schuck v. Beck I)*, http://www.courts.wa.gov/opinions/pdf/367541_unp.pdf. *Schuck v. Beck I*, holds no precedential value because of its unpublished status. More importantly, *Schuck v. Beck I* addressed the liability of Tim Jackson, the owner of the land, who played no role in sending the cylinder tank to Pacific Steel. Jackson did not engage in the same activity germane to the liability of Tom Reinland.

Factor (d)

The fourth factor focuses on whether the activity is of common usage. An activity is a matter of common usage if it is customarily carried on by the great mass of mankind or by many people in the community. RESTATEMENT (SECOND) OF TORTS § 520 cmt. e. Automobile driving is an example of common activity. The manufacture, storage, transportation, and use of high explosives are carried on by a comparatively small number of persons and therefore are not a matter of common usage. Comment e to § 520; *Klein v. Pyrodyne Corp.*, 117 Wn.2d 1, 9 (1991). We conclude that, under the fourth factor of § 520, the storage, handling, and transfer of chlorine and the recycling of cylindrical chlorine tanks are not common activities.

Factor (e)

51

The fifth factor under § 520 is the appropriateness or inappropriateness of the activity in its location. One decision promotes the fifth factor as critical. *Arlington Forest Associates v. Exxon Corp.*, 774 F. Supp. 387, 391 (E.D. Va. 1991). The more appropriate an activity is to its setting, the less likely it is to be considered abnormally dangerous. *Arlington Forest Associates v. Exxon Corp.*, 774 F. Supp. 387, 391 (E.D. Va. 1991). In *Arlington Forest Associates*, the United States District Court held that the operation of a filling station did not constitute an abnormally dangerous activity because numerous gasoline stations dot our cities and rural areas.

We conclude that a recycling center with its cutting machines and many employees constitutes an inappropriate location to send a chlorine cylinder tank. The location of Pacific Steel being in an industrial location did not reduce the dangerousness of the activity because of the many employees in an industrial area during work hours.

Factor (f)

Under the sixth factor, whether strict liability or negligence principles should apply entails a balancing of conflicting social interests and the weighing of the risk of harm versus the utility of the activity. In balancing these interests, we must ask who should bear the loss caused by the unfortunate event. *Langan v. Valicopters, Inc.*, 88 Wn.2d 855, 865 (1977).

As a criterion for determining strict liability, factor (f) has received criticism among legal writers. Section 520(f) conflicts with the purpose behind absolute liability

of requiring useful but dangerous activities to pay their own way. *Langan v. Valicopters, Inc.*, 88 Wn.2d 855, 864-65 (1977); 2 HARPER & JAMES, LAW OF TORTS, Comment to s 14.4 (Supp. 1968); Note, Regulation and Liability in the Application of Pesticides, 49 Iowa L. Rev. 135, 144-45 (1963).

We agree that chlorine has value to the community as a cleansing agent, among other uses. We agree that recycling serves a societal interest. Still chlorine bears highly dangerous attributes. As the less innocent party, Tom Reinland should bear the loss.

Synthesis of factors (a) through (f)

When amalgamating the six factors for an abnormally dangerous activity, we return one more time to our principal case, *Siegler v. Kuhlman*, 81 Wn.2d 448 (1972), and provide a completer analysis of the decision. Teenager Carol House died in the flames of a gasoline explosion when her car encountered a pool of spilled gasoline in the darkness of the evening along Capitol Lake Drive in Olympia. House's vehicle struck an object. Then came a muffled explosion and searing flames from gasoline that engulfed her car.

The source of the spilled gasoline was a truck and trailer combination driven by experienced driver Aaron Kuhlman. On that fatal day, Kuhlman drove a gasoline truck and trailer unit, fully loaded with gasoline, from the Texaco bulk plant in Tumwater to Port Angeles. Before leaving the Texaco plant, he inspected the trailer, including checking the lights, hitch, air hoses, and tires. Kuhlman started on his journey after 6

53

p.m. to deliver his cargo, 3,800 gallons of gasoline in the truck tank and 4,800 gallons of gasoline in the trailer tank. After traveling northbound for one mile on Interstate 5, he exited on an off-ramp to enter Highway 101 at the Capitol Lake I-5 interchange. While running downgrade on the off-ramp, Kuhlman felt a jerk, looked into his left-hand and right-hand mirrors, and saw the trailer lights out of place. The trailer moved, but leaned to its right side. The trailer then disengaged from the truck. The tank trailer crashed through a chain-link highway fence and came to rest upside down on Capitol Lake Drive below. A fire from disgorged gasoline flashed and spread one hundred feet down the road. Carol House perished in the inferno.

No expert could definitely discern why the fuel truck's trailer disengaged from the truck. Carol House's estate sought to prove both negligence on the part of the driver and owner of the vehicle and to bring the proven circumstances within the res ipsa loquitur doctrine. The estate did not plead absolute liability. Defendants sought to obviate all inferences of negligence and the circumstances leading to the application of res ipsa loquitur by showing due care in inspection, maintenance, and operation of the truck and trailer.

The Washington Supreme Court, in *Siegler v. Kuhlman*, ruled that the plaintiff need not prove negligence or establish res ipsa loquitur. Perhaps unexpectedly the high court remanded to the trial court for the sole purpose of assessing damages to be awarded Carol House's survivors. The Supreme Court held the driving of the fuel truck on a

highway to be an abnormally dangerous activity that warrants absolute liability.

The Washington Supreme Court, in *Siegler v. Kuhlman*, commented that hauling gasoline as freight is common. Nevertheless, when gasoline is carried as cargo, as distinguished from fuel for the carrier vehicle, the activity assumes uniquely hazardous characteristics because of the size of the load, its bulk or quantity, and its movement along the highways. The transportation of the gasoline created an extreme hazard because of the possible release of a highly volatile and explosive vapor. The activity created a risk regardless of the reasonable care on the part of Kuhlman. Despite presumably being a careful and prudent motorist, Carol House unexpectedly and without warning encountered a gasoline pool and vapor that ignited into a holocaust.

The Supreme Court, in *Siegler v. Kuhlman*, emphasized that absolute liability should follow from a catastrophic accident in which an explosion or fire destroys the evidence that could help one to discern the cause of the accident. Thus the rule rests in part on problems of proof. Nevertheless, the rule of absolute liability also rests on the ultimate idea of rectifying a wrong and putting the burden where it should belong as a matter of abstract justice on the one of the two innocent parties whose acts instigated or made the harm possible.

*Siegler v. Kuhlman* presents a significant dissimilarity from Felix Schuck's suit. The rush of the chlorine gas from the ruptured cylindrical tank did not destroy the evidence of what caused the release of the chlorine. Despite this difference, we notice

many parallels between the two tragedies. Tom Reinland arranged for the transport of a volatile and extremely dangerous substance to a place where many others would be present. His conduct exposed many to a deadly risk.

A compelling parallel between Carol House's death and Felix Schuck's injuries concerns the predicament in which each victim found herself or himself. House minded her own business, carried on normal daily activities, and drove on a road open to her. She was defenseless to the calamity awaiting her. Felix Schuck went about his daily work tasks to earn an income for his family. Tom Reinland could have prevented the catastrophe waiting to happen. Other workers at Pacific Steel & Recycling may have been able to prevent the accident, but Schuck had no opportunity to prevent the calamity and no inkling of the fate that awaited him. Schuck was helpless in the presence of the ruptured and oozing tank of hazardous chlorine gas. The Washington Supreme Court emphasized Carol House's status as an innocent bystander when imposing absolute liability on Aaron Kuhlman. Schuck, like House, was an innocent bystander.

We recognize that some foreign decisions conflict with *Siegler v. Kuhlman* in that the courts denied absolute liability for the transport or storage of gasoline. *Ozark Industries, Inc. v. Stubbs Transports, Inc.*, 351 F. Supp. 351 (W.D. Ark. 1972); *Hennigan v. Atlantic Refining Co.*, 282 F. Supp. 667 (E.D. Pa. 1967), *aff'd*, 400 F.2d 857 (3d Cir. 1968); *Matomoco Oil Co. v. Arctic Mechanical, Inc.*, 796 P.2d 1336 (Aka. 1990). In

*Apodaca v. AAA Gas Co.*, 73 P.3d 215, 226-27 (Ct. N.M. App. 2003), the court cited and discussed *Siegler v. Kuhlman* as an outlying decision.

We question whether the Washington Supreme Court will accept our ruling as correct since it has not addressed the legitimacy of *Siegler v. Kuhlman* since its pronouncement in 1979. Some Washington decisions since have ignored the teachings of the decision. *New Meadows Holding Co. v. Washington Water Power Co.*, 102 Wn.2d 495 (1984); *Crosby v. Cox Aircraft Co. of Washington*, 109 Wn.2d 581, 746 P.2d 1198 (1987). The *Siegler* decision is an outlier among other jurisdictions' rulings. Despite our questioning the continuing viability of *Siegler*, we value the decision's fundamental analysis of imposing liability on the least innocent party when dangerous conduct exposes others to great injury.

After our review of all six factors found in *Restatement (Second) of Torts* § 520, we hold that Tom Reinland engaged in an abnormally dangerous activity that warrants absolute liability. In his analysis, Reinland only examines one of the six factors—factor (c). He fails to weigh, let alone mention, those facts showing satisfaction of other factors. Felix Schuck need not show the fulfillment of all factors, let alone a majority of the factors. Factors (a),(b), (d), and (e) weigh in favor of absolute liability, and factor (f) also likely militates in favor of Reinland being found engaged in an abnormally dangerous activity. Although factor (c) may be of more importance than some of the other factors,

satisfaction of this factor is not essential. Some facts even suggest fulfillment of factor (c).

*Bench Question*

American jurisdictions universally hold that the court determines as a matter of law, rather than a jury as a matter of fact, whether an activity is abnormally dangerous. *Klein v. Pyrodyne Corp.*, 117 Wn.2d 1, 6 (1991); *Langan v. Valicopters, Inc.*, 88 Wn.2d 855, 861 (1977); *Apodaca v. AAA Gas Co.*, 73 P.3d 215 (2003); *Matomoco Oil Co. v. Arctic Mechanical, Inc.*, 796 P.2d 1336 (Aka. 1990); *Erbrich Products Co., Inc. v. Wills*, 509 N.E.2d 850, 857 (Ind. Ct. App. 1987); *SKF Farms v. Superior Court*, 153 Cal. App. 3d 902, 905, 200 Cal. Rptr. 497 (1984); *Clark-Aiken Co. v. Cromwell-Wright Co.*, 367 Mass. 70, 323 N.E.2d 876, 888 (1975); *Plourde v. Hartford Electric Light Co.*, 31 Conn. Supp. 192, 326 A.2d 848, 851 (1974); *McLane v. Northwest Natural Gas Co.*, 255 Or. 324, 467 P.2d 635, 637 (1970); RESTATEMENT (SECOND) OF TORTS § 520 cmt. 1 (1977). In *Matomoco Oil Co. v. Arctic Mechanical, Inc.*, 796 P.2d 1336 (Aka. 1990), the trial court erred in submitting to the jury the question of whether the welding, buffing, or grinding of a petroleum tanker was an ultrahazardous activity, since the determination must be made by the court.

We question the soundness of this universal rule. The facts relevant to imposing absolute liability could be disputed. For example, questions of fact may exist, in this pending appeal, as to whether Tom Reinland possessed constructive knowledge of

chlorine's presence in the cylinder tank and whether the allegedly negligent conduct of Gordon Beck and Pacific Steel & Recycling was foreseeable. Juries generally resolve disputed facts.

The question of whether the circumstances of the suit fits one or more of the six factors for an abnormally dangerous activity is fact specific, a phenomenon that suggests a jury should decide whether to impose absolute liability. We also wonder if judges should engage in a scientific inquiry or industrial technology analysis often without little input from experts. Nevertheless, the weighing of numerous factors, including balancing the value of the activity for the community against the danger of the activity, perhaps should be performed only by a court. *See Martin v. Gonzaga University*, 200 Wn. App. 332, 370-71, 402 P.3d 294 (2017), *aff'd in part, rev'd in part*, 191 Wn.2d 712, 425 P.3d 837 (2018).

WASH. CONST. art. I, § 21 declares that the "right of trial by jury shall remain inviolate." The term "inviolate" connotes deserving of the highest protection and indicates that the right must remain the essential component of our legal system that it has always been. *Davis v. Cox*, 183 Wn.2d 269, 288-89, 351 P.3d 862 (2015). When the question is doubtful, the court always preserves the right to a jury trial. *Bain v. Wallace*, 167 Wash. 583, 587, 10 P.2d 226 (1932); *Furnstahl v. Barr*, 197 Wn. App. 168, 175, 389 P.3d 635 (2016). At its core, the right of trial by jury guarantees litigants the right to

have a jury resolve questions of disputed material facts. *Davis v. Cox*, 183 Wn.2d 269, 289 (2015).

The right to a jury trial extends to a civil proceeding. *Sofie v. Fibreboard Corp.*, 112 Wn.2d 636, 644, 771 P.2d 711, 780 P.2d 260 (1989). In determining the nature of civil suits subject to the right to a jury trial, the court interprets the constitutional provision as guaranteeing those rights which existed at the time of the adoption of the constitution in 1889. *In re Marriage of Firchau*, 88 Wn.2d 109, 114, 558 P.2d 194 (1977). One might question whether the right to a jury arises in an absolute liability claim when the Washington Supreme Court did not approve of the doctrine until 1979. No party to an appeal, in a Washington appellate court decision, has asserted a constitutional right to a jury trial on a cause of action for absolute liability.

Of course, just because the law dictates that the bench resolve a cause of action does not mean that the issue should be resolved on summary judgment. In the face of issues of fact, the trial court could conduct an evidentiary hearing. Other areas of law demand that the court, not a jury, decide the case, such as real property cases. But the court still conducts a trial if the suit presents issues of material fact. Nevertheless, none of the reported cases addressing absolute liability involve the trial court conducting an evidentiary hearing.

In *In re Hanford Nuclear Reservation Litigation*, 350 F. Supp. 2d 871, 875 (E.D. Wash. 2004), the defendants argued that the district court should not grant the plaintiffs'

summary judgment motion because of an incomplete record. The court disagreed because both parties had sufficient opportunity to present a complete factual record on the dispositive motion and both parties submitted significant documentary evidence in support of their statement of facts. The court reasoned that the record contained enough evidence for the court to determine the question of absolute liability and to grant the plaintiffs summary judgment on the claim. In *Siegler v. Kuhlman*, the Washington Supreme Court declined to remand the case for further development of the facts when granting Carol House's family judgment on liability with apparently no earlier notice.

Felix Schuck did not seek summary judgment on his claim of absolute liability for an abnormally dangerous activity. We could remand the case to the superior court for further proceedings, including a potential summary judgment motion by Schuck. Nevertheless, the parties presumably have presented all of their facts in support of or in opposition to Tom Reinland's summary judgment motion. Neither party has suggested that the superior court should conduct an evidentiary hearing before ruling on absolute liability. Neither party has suggested they wish to present further evidence pertinent to the absolute liability cause of action. We sit in as good of a position as the trial court in making this determination since both courts have reviewed the same declarations and legal arguments.

The dissent suggests that Tom Reinland may wish to assert the defense of assumption of risk under *Restatement (Second) of Torts* § 523. Reinland does not

expressly plead assumption of risk, but Reinland alleges in his answer to the amended complaint that Felix Schuck "may have" engaged in "culpable conduct." CP at 35. Under § 523, "the plaintiff's voluntary acceptance of the abnormal risk" bars recovery. RESTATEMENT (SECOND) OF TORTS § 523 cmt. b. The dissent does not explain how Felix Schuck voluntarily accepted the risk when he proceeded with his normal work routine. During summary judgment proceedings, Reinland never suggested, let alone presented any facts, supporting a defense of assumption of risk.

When the relevant facts are not in dispute, the reviewing court may order entry of summary judgment in favor of the nonmoving party. *Impecoven v. Department of Revenue*, 120 Wn.2d 357, 365, 841 P.2d 752 (1992); *Leland v. Frogge*, 71 Wn.2d 197, 201, 427 P.2d 724 (1967); *Patriot General Insurance Co. v. Gutierrez*, 186 Wn. App. 103, 110, 344 P.3d 1277 (2015). We grant Felix Schuck summary judgment on his claim for absolute liability based on an abnormally dangerous activity.

Hazardous Waste Management Act

Tom Reinland contends that the trial court erred in concluding that an issue of fact existed as to whether Reinland possessed a statutory duty of care under the Hazardous Waste Management Act. He argues that the act does not apply to him because he does not meet the act's definition of a "generator" or "transporter." We agree.

In enacting the HWMA, the legislature expressed its intent "to establish a comprehensive statewide framework for the planning, regulation, control, and

management of hazardous waste which will prevent land, air, and water pollution and conserve the natural, economic, and energy resources of the state." Former RCW 70.105.007. Both civil and criminal penalties may be imposed for a violation of the chapter. Former RCW 70.105.080, .085. The HWMA provides that a person who sustains an injury as a result of a violation of the chapter may bring suit for damages. Former RCW 70.105.097.

The Department of Ecology (DOE) is granted "broad powers of regulation" in the management of hazardous waste. Former RCW 70.105.007(1). WAC 173-303, a regulation adopted by the DOE, implements the HWMA. WAC 173-303-010. Pursuant to the WAC, the act applies to the following persons or entities:

> (1) Generators;
> (2) Transporters;
> (3) Owners and operators of dangerous waste recycling, transfer, storage, treatment, and disposal facilities; and
> (4) The operator of the state's extremely hazardous waste management facility.

WAC 173-303-020.

Felix Schuck argues that Tom Reinland functioned as a "generator" of waste. A DOE regulation defines "generator" as follows:

> . . . any person, by site, whose act or process produces dangerous waste or whose act first causes a dangerous waste to become subject to regulation.

WAC 173-303-040. In turn, DOE defines "person" as:

> . . . any person, firm, association, county, public or municipal or private corporation, agency, or other entity whatsoever.

Former RCW 70.105.010(14). "Dispose or disposal" is defined as:

> . . . the discarding or abandoning of hazardous waste or the treatment, decontamination, or recycling of such wastes once they have been discarded or abandoned.

Former RCW 70.105.010(6).

To "generate" means to "cause to be" or to "bring into existence." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 945 (2002). The WAC definition of a "generator" echoes this dictionary definition, since the DOE definition limits the category of "generator" to the person who, through his own conduct, created the hazardous waste or the person whose action "first" caused the waste to become subject to regulation. Thus, to impose generator liability on Tom Reinland under the HWMA, Schuck must produce evidence that Reinland either engaged in a process, the product of which was a waste defined as hazardous under the regulations or that he was the first person to dispose of the waste. Schuck has tendered no such evidence.

Felix Schuck argues that Tom Reinland qualifies as a generator of hazardous waste because he released the chlorine tank from where it was stored. According to Schuck, Reinland, in disposing of the discarded and abandoned chlorine tank, first subjected the tank to regulation under the HWMA. We disagree. The evidence shows that the tank was already abandoned at the time that Gordon Beck removed the tank from

the Jackson property.  Under the definition of "disposal," someone previously abandoned or discarded the tank.  Reinland never abandoned the tank.  Also, Reinland engaged in no process that created the chlorine.

Attorney Fees under the HWMA

Felix Schuck contends that his appellate attorney fees should be awarded under the HWMA if he prevails on remand.  Because we dismiss Schuck's claim under the act, Schuck will not be entitled to any fees under the act.

CONCLUSIONS

We reverse the superior court's denial of summary judgment to Tom Reinland on Felix Schuck's claims for common law negligence and for liability under the HWMA, and we dismiss the two causes of action as a matter of law.  We affirm the superior court's denial of Reinland's motion for summary judgment on Schuck's claim for supplier liability under *Restatement (Second) of Torts* § 388.  We reverse the superior court's summary judgment dismissal of Schuck's claim for supplier of a chattel liability under *Restatement (Second) of Torts* § 392.  Finally, we reverse the superior court's dismissal of the cause of action for absolute liability for an abnormally dangerous activity.  In turn, we grant Felix Schuck summary judgment on his claim of absolute liability under *Restatement (Second) of Torts* §§ 519 and 520 against Tom Reinland.  Assuming the Supreme Court does not reverse this court's ruling on absolute liability, the claims other than the cause of action for absolute liability become moot.  This court

65

remands to the superior court for trial solely on the question of damages and whether

other Reinland entities can be held responsible for the abnormally dangerous activity of

Tom Reinland.

_____
Fearing, J.

I CONCUR:


_____
Siddoway, A.C.J.

No. 37213-8-III

STAAB, J. (Dissenting) — Tom Reinland contracted with Gordon Beck to recycle scrap metal from an old construction yard. The scrap metal was loaded on a truck operated by Pacific Steel & Recycling (Pacific). The lot of scrap metal included a pressurized chlorine tank. The tank was a dirty metal cylinder with a valve. After multiple people failed to recognize the metal cylinder as a pressurized chlorine tank, it was placed into a shearing machine at Pacific and punctured. As the poisonous gas released, one person died and 13 others were hospitalized, including Felix Schuck. In this case, we are asked to decide which causes of action against Tom Reinland are supported by evidence sufficient to raise a material issue of fact for a jury.

After carefully reviewing each cause of action, I agree with the majority that Schuck's evidence supports a claim for negligence under *Restatement (Second) of Torts* § 392 (AM. LAW INST. 1965). I also agree that his claims under common law negligence and the Hazardous Waste Management Act, chapter 70.105 RCW are not supported by the evidence. However, I disagree that liability can be found for failing to warn under § 388. I also disagree that the activity in this case was abnormally dangerous sufficient to impose absolute liability. Finally, I disagree that we should sua sponte grant summary

judgment against Reinland on the issue of absolute liability. I therefore concur in part and dissent in part. Because absolute liability is dispositive, I address that issue first and then discuss liability under theories of negligence.

A. SECTIONS 519-520 — STRICT OR ABSOLUTE LIABILITY

I disagree with the majority's conclusion on absolute liability. To begin with, I oppose the majority's overly narrow and specific characterization of the activity we are to consider. By defining the "activity" as "directing the transport of a cylinder tank containing chlorine to a busy business for recycling, which recycling would include placing the tank in a shear machine," the majority incorporates not only negligence but unintended consequences. Majority at 33-34.

An activity is abnormally dangerous if it is "dangerous in its normal or non-defective state." *Arlington Forest Assoc. v. Exxon Corp.*, 774 F. Supp. 387, 392 (E.D. Va. 1991) (quoting *Fallon v. Indian Trail Sch.*, 148 Ill. App. 3d 931, 500 N.E.2d 101, 103, 102 Ill. Dec. 479 (1986)). In order to promote the policies behind absolute liability, the activity should be broadly defined by the intentions or expectations of the defendant. The activity should not be predicated on the "'causal or collateral negligence of others with respect to [the activity] under the particular circumstances.'" *Id*.

Contrary to the majority's assertion, cases applying the § 520 factors consistently "define the activity broadly and then consider the nature of the locality where the activity is conducted in determining whether the risk of harm is high." *Hurley v. Port Blakely*

2

*Tree Farms L.P.*, 182 Wn. App. 753, 763, 332 P.3d 469 (2014). In *Hurley*, property owners sued logging companies after a landslide damaged their property. In arguing that strict liability should apply, the plaintiffs urged the court to apply a narrow definition of the activity as "clearcutting on steep, unstable slopes directly above a residential area." *Id*. at 763. Upon review of other cases in Washington, the *Hurley* court rejected this overly narrow definition in favor of the broad activity of "logging in a remote area." *Id*. The operative question was whether the general activity of logging carried a high degree of risk of harm from landslides "given the characteristics of the area where it was conducted." *Id*.

In this case, the majority uses an overly-narrow and case-specific definition of the activity as "directing the transport of a cylinder tank containing chlorine to a busy business for recycling, which recycling would include placing the tank in a shear machine." Majority at 32-33. In doing so, the majority defines the activity by the end result that no one intended, which includes the negligence of others. There is no evidence that anyone intended or expected to put a pressurized chlorine tank in a shearing machine. Indeed the evidence is that every person involved knew the dangers of recycling a pressurized chlorine tank, and had they recognized the tank, would not have put it on the truck, or delivered it to Pacific's yard, or placed it in the shearing machine. Their actions or inactions in the face of this known danger are indicative of negligence which must be removed from consideration in order to properly define the activity.

The majority's reliance on *Siegler v. Kuhlman*, 81 Wn.2d 448, 502 P.2d 1181 (1972) to support its definition of the activity is also misplaced. In *Seigler* the activity found to be abnormally dangerous was "hauling gasoline as freight." *Id*. at 454. Such was the intended activity without consideration of negligence. The court found this activity to be abnormally dangerous because the magnitude of harm caused by gasoline escaping the truck was "beyond calculation" and any evidence of negligence would likely be lost in the ensuing explosion. *Id*. at 454-55. In each case where our courts have found an abnormally dangerous activity, the "activity" was intended by the defendant without consideration of negligence. *Klein v. Pyrodyne Corp.*, 117 Wn.2d 1, 6, 810 P.2d 917, (1991) (holding public fireworks display); *Langan v. Valicopters*, *Inc*., 88 Wn.2d 855, 567 P.2d 218 (1977) (crop dusting); *Vern J. Oja and Assoc. v. Wash. Park Towers, Inc.*, 15 Wn. App. 356, 549 P.2d 63 (1976) (pile driving).

Other jurisdictions have similarly defined the activity as that which is intended without consideration of negligence. In *Apodaca v. AAA Gas Co.*, 2003-NMCA-085, 134 N.M. 77, 85, 73 P.3d 215 (2003), the defendant delivered a propane truck to a shop for repairs. When employees attempted to repair the truck, the propane exploded. The parties disputed whether the defendant advised the shop that the truck was almost full of propane, but agreed that the accident could have been avoided if the tank had been purged of propane or the repairs conducted outside. In arguing that the defendant should be strictly liable, the plaintiff defined the activity as "handing over a fully loaded propane

4

truck for repair to mechanics, who are unlicensed and inexperienced in the safe handling of propane, at a repair shop located in the heart of Albuquerque." *Id*. at 88. Citing *Arlington Forest*, the court rejected this overly narrow definition, noting that such a definition would swallow the rule. *Id*. (citing *Arlington*, 774 F. Supp. at 392). "'Any plaintiff in a negligence action could simply characterize the offending behavior as incapable of being safely performed even with due care, thus bringing it within the scope of strict liability.'" *Id*. (quoting *Arlington Forest*, 774 F. Supp. at 392). Instead, the court characterized the activity as the handling of liquid propane and found it was not abnormally dangerous because reasonable precautions can reduce, if not eliminate, explosions. *Id*. at 87-88.

When we apply the correct rule in defining the activity, we consider the normal, i.e., intended activity without consideration of negligence or defect. Here, the intended activity was recycling scrap metal, but even assuming we can charge Reinland with knowledge of the tank, then his intended activity was disposing of the chlorine tank. This is the broad activity that the parties intended and had it been conducted without negligence, it is the activity that would have occurred without incident. By including the particular elements of negligence into the definition of the activity, the majority's decision will, "in effect, enable plaintiffs to invoke strict liability for all negligently-conducted activity." *Arlington*, 774 F. Supp. at 392.

5

Contrary to the majority's decision, I would hold that recycling scrap metal or even disposing of a chlorine tank is not an abnormally dangerous activity. As the majority notes, the six factors to consider are laid out in § 520.[1]

I would agree that disposing of chlorine tanks carries a high degree of risk of harm and that the resulting harm could be great. RESTATEMENT § 520(a), (b). I would also agree that scrapping metal, including chlorine tanks, is not a matter of common usage and requires specialized knowledge and skills. *Id*. at § 520(d).

On the other hand, the activity is appropriate to the place where it is conducted and disposing of such tanks is valuable to the community. *Id*. at § 520(e), (f). Scrapping metal has been an effective and common way that the United States has reached its environmental goal to reduce the consumption of raw materials. In a response, the U.S. Environmental Protection Agency outlined the guidelines for recycling activities such as scrapping metal and claimed that it is not subject to hazardous waste regulation when recycled. United States Environmental Protection Agency, Safe Hazardous Waste

---

[1] "In determining whether an activity is abnormally dangerous, the following factors are to be considered:"
   (a) existence of a high degree of risk of some harm to the person, land or chattels of others;
   (b) likelihood that the harm that results from it will be great;
   (c) inability to eliminate the risk by the exercise of reasonable care;
   (d) extent to which the activity is not a matter of common usage;
   (e) inappropriateness of the activity to the place where it is carried on; and
   (f) extent to which its value to the community is outweighed by its dangerous attributes.

Recycling (Oct. 2020).[2]  The recycling of materials such as scrap metal stops the

accumulation of hazardous materials and betters human health and the environment.  *Id*.

Hence, it is entirely appropriate and necessary for communities, like Spokane, to recycle

metal at a licensed scrap metal site.

The activity was also appropriate to the place where it was conducted.

RESTATEMENT (SECOND) OF TORTS § 520(e).  This factor considers the location of the

activity in proximity to the density of people.  As the comments note, an activity capable

of great harm is not abnormally dangerous when carried out in a remote location.  *Id*. at §

520 cmt. (j).  The majority misreads this factor and finds that a recycling center is an

inappropriate place to bring a chlorine tank.  I disagree.  Pacific's site is located in an

industrial area of Spokane as opposed to a residential area.  Pacific has been involved in

the scrap metal operation since the 1950s.  In Washington State, a scrap metal location

may only operate after completing the application process under RCW 19.290.110.  There

is no evidence presented that Pacific was in violation of these licensing rules.

While all of these factors should be considered, courts have generally found the

third factor, the inability to eliminate the risk by the exercise of reasonable care, as

indispensable in finding an activity to be abnormally dangerous.  *See* GERALD W.

---

[2] Environmental Protection Agency's fact sheet on "Safe Hazardous Waste Recycling" (Jan. 2021).  https://www.epa.gov/sites/default/files/2016-02/documents /safehwrecyclingfactsheete00-001d.pdf (last visited Oct. 12, 2021).

BOSTON, STRICT LIABILITY FOR ABNORMALLY DANGEROUS ACTIVITY: THE NEGLIGENCE

BARRIER, 36 San Diego L. Rev. 597, 622, 635 n.178 (1999); JOSEPH H. KING, JR., A

GOALS-ORIENTED APPROACH TO STRICT TORT LIABILITY FOR ABNORMALLY

DANGEROUS ACTIVITIES, 48 Baylor L. Rev. 341, 365 n.131 (1996); 57A Am. Jur. 2d

Negligence § 396.[3]  "Central to the determination of whether an activity is abnormally

dangerous is whether it could be made safe through the exercise of reasonable care."

*Arlington Forest*, 774 F. Supp. at 390 (citing *Philip Morris, Inc. v. Emerson*, 235 Va.

380, 368 S.E.2d 268 (1988)) (holding that strict liability would not apply to the disposal

of the highly toxic chemical pentaborane, chiefly because such disposal could have been

conducted safely if reasonable precautions had been taken).

While there will always be a risk when recycling scrap metal or disposing of a

chlorine tank, there is not a "high degree of risk" when reasonable care is employed.  In

*New Meadows Holding Co. v. Wash. Water Power Co.*, 102 Wn.2d 495, 501, 687 P.2d

212 (1984), our Supreme Court held that "the risk" in factor (c) refers to the "high degree

of risk" in factor (a).  "Thus, factor (c) addresses itself to the question of whether,

through the exercise of ordinary care, the risk inherent in an activity can be reduced to the

point where it can no longer be characterized as a 'high degree of risk.'"  *Id.*  In *New*

---

[3] "While the other factors should not be ignored, the factor under Restatement Second, Torts § 520 (c)—the inability to eliminate the risk by the exercise of reasonable care—is at the core of liability under *Restatement Second Torts* § 519 for abnormally dangerous activities."

*Meadows*, the court found that some degree of risk of leaking is inherent to a natural gas pipeline. But since the pipelines were highly regulated, the "high degree of risk" from transporting natural gas through underground lines can be eliminated by the use of reasonable care and legislative safeguards. *Id*. at 502.

Perhaps the most persuasive authority on this issue is our prior decision in this case by a different panel. In *Schuck v. Beck*, No. 36754-1-III, slip op. at 6 (Wash. Ct. App. Apr. 21, 2020) (unpublished), www.courts.wa.gov/opinions/pdf/367541_unp.pdf, this court held that the disposal of a chlorine tank does not constitute an abnormally dangerous behavior. "The fact that a tank of chlorine gas can be safely disposed of undermines the argument that Jackson should be held strictly liable." *Id*.[4]

The majority recognizes the significance of this third factor, and analyzes the different outcomes in *Siegler* and *New Meadows*, but incorrectly concludes that this case is more analogous to *Siegler* than *New Meadows*. In doing so, the majority mischaracterizes the activity to include the "transportation of chlorine gas or the chopping of a chlorine tank." Majority at 33-34. This is not a transportation case. Contrary to the majority's characterization of the activity, absolutely no damage or injury resulted from the transportation of the chlorine tank. Nor should the activity be defined

---

[4] Neither party raises "law of the case" doctrine. Related doctrines—Law of the case, 14A Douglas J. Ende, *Washington Practice*, *Civil Procedure* § 35:57 at 642 (3d ed. 2018).

9

as chopping a chlorine tank. Every party in this case agrees that the tank should not have been placed in the shearing machine. If the parties were actually in the business of putting pressurized chlorine tanks in a shearing machine, the analysis under absolute liability would be completely different and the activity would most likely be abnormally dangerous.

The majority also finds that imposing strict liability on Reinland will "encourage" those involved in scrapping metal to adopt safer methods of conduct. Majority at 34. But if the activity qualifies as abnormally dangerous, then by definition no amount of "encouragement" would eliminate the high degree of risk. *See* § 519(1); *State v. Ventron Corp.*, 94 N.J. 473, 468 A.2d 150 (1983) (disposal of mercury wastes abnormally dangerous; no safe technique available for disposal; hence the risk of harm is unavoidable).

Similar to a natural gas pipeline, there is always some degree of risk inherent in scrapping metal or disposing of a chlorine tank. As this case demonstrates, when reasonable care is used, the high degree of risk associated with disposing of a chlorine tank can be eliminated. When accidents do occur, the application of negligence is sufficient to address liability. (See below.) I would conclude that recycling scrap metal or the disposal of chlorine tanks is not an abnormally dangerous activity and absolute liability should not apply.

B.   GRANTING SUMMARY JUDGMENT TO SCHUCK

I also dissent from the majority's decision to sua sponte grant summary judgment to Schuck on the issue of absolute liability. As the majority points out, Schuck is not seeking summary judgment on this claim. The issue is before us because Reinland moved to dismiss Schuck's claim. Even in the face of the majority's incorrect decision to find an abnormally dangerous activity and absolute liability, Reinland is still entitled to raise defenses before the trial court. For instance, Reinland may wish to argue assumption of risk under § 523. Regardless of the merits of such defenses, denying Reinland the opportunity to argue them raises serious due process concerns.

C.   RESTATEMENT (SECOND) OF TORTS § 388 — DUTY TO WARN OF CHATTEL
     KNOWN TO BE DANGEROUS

The parties generally agree that had reasonable care been exercised, this accident would have been avoided. For this reason, absolute liability should not be imposed. Instead, we should consider which theories of liability under negligence should apply. As I set forth below, I disagree that Reinland had a general duty to warn but I do believe he could be found liable under § 392 as a business supplier.

The majority finds that Reinland can be found liable for breaching the general duty to warn found in § 388. I disagree. While this rule applies to all suppliers of chattel, it is limited to dangers a supplier knows or has reason to know. This is different than constructive knowledge. Under this rule there is no duty to affirmatively inspect or

11

investigate chattel for dangers. Because there is no evidence that Reinland knew or had reason to know that the chlorine tank existed on the property, he had no duty under § 388 to warn a subsequent user.

The complaint alleges a cause of action against Reinland for violating a duty to warn under § 388. This particular section is generally referred to as a duty to warn rule. Liability under this section applies when a supplier "knows or has reason to know that the chattel is or likely to be dangerous for the use for which it is supplied," and fails to warn the user of the danger. RESTATEMENT § 388.

As the majority points out, Reinland raises several defenses to the application of this provision. Reinland argues that he had no duty to warn Schuck under § 388 because he did not know, or have reason to know of the chlorine tank. In response, Schuck asserts that Reinland's actual knowledge is irrelevant under this section because Reinland should have known of the dangers and had a duty to inspect the bulk scrap metal for dangers. The majority opinion agrees with this position.

While acknowledging that there is no evidence that Reinland knew of the chlorine tank, the majority incorrectly interprets § 388 as imposing an affirmative duty on Reinland to inspect the bulk scrap metal for dangerous items under the theory that he should have known that bulk scrap metal might contain dangerous items. This conclusion ignores the plain language of the rule and its comments. Section 388 only imposes a duty to warn when a supplier "knows or has reason to know" of a dangerous

12

condition. The majority's position, that this phrase creates an affirmative duty to inspect, incorrectly conflates "reason to know" with "should know."

The two phrases are not synonymous. When used in the *Restatements*, "reason to know" is what a reasonable person would know or infer based on the information available to them. RESTATEMENT § 12(1).[5] Whereas "should know" requires prudence, and the duty to ascertain facts based on information known. *Id*. at § 12(2). A person has "reason to know" or infer a fact when "its existence is so *highly probable* that his conduct would be predicted upon the assumption that the fact did exist." *Id*. at § 12 cmt. a (emphasis added). On the other hand, when a person "should know" a fact, they are under an affirmative duty to use reasonable diligence to ascertain that fact. *Id*.

Applying the correct definition of these terms, the question is whether Reinland was aware of facts that would make it "so highly probable" that the yard of scrap metal would contain a pressurized chlorine tank, that he should have warned Pacific of this likelihood. The actions of each party in this case belie this probability.

---

[5]  (1) The words "reason to know" are used throughout the Restatement of this Subject to denote the fact that the actor has information from which a person of reasonable intelligence or of the superior intelligence of the actor would infer that the fact in question exists, or that such person would govern his conduct upon the assumption that such fact exists. (2) The words "should know" are used throughout the Restatement of this Subject to denote the fact that a person of reasonable prudence and intelligence or of the superior intelligence of the actor would ascertain the fact in question in the performance of his duty to another, or would govern his conduct upon the assumption that such fact exists.

The majority also relies on § 388 comment (b) to support its position that § 388 creates an affirmative duty upon a supplier to investigate and inspect chattel for unknown dangers. The comment reads:

> One who supplies a chattel for another to use for any purpose is subject to liability for physical harm caused by his failure to exercise reasonable care to give to those whom he may expect to use the chattel any information as to the character and condition of the chattel which he possesses, and which he should recognize as necessary to enable them to realize the danger of using it.

*Id*.

The majority focuses on the words "should recognize" to support its position that the section creates an affirmative duty to inspect for unknown dangers. In doing so, the majority ignores the preceding clause: "any information as to the character and condition of the chattel *which he possesses*." *Id*. (emphases added). In other words, a supplier needs to pass along *known* information about dangerous conditions that a reasonable person would recognize as necessary to protect the user. The phrase "should recognize," as used in the comments, is not equivalent to "should know," and does not create a new duty to investigate.

The majority also relies on a sentence in comment (m) to find authority for imposing an affirmative duty to inspect chattel. *See* Majority at 22. The relevant portion of the comment reads:

> *Inspection*. The fact that a chattel is supplied for the use of others does not of itself impose upon the supplier a duty to make an inspection of the

14

> chattel, no matter how cursory, in order to discover whether it is fit for the use for which it is supplied. Such a duty may be imposed because of the purpose for which the chattel is to be used by those to whom it is supplied (see § 392).

*Id*. After making it explicit that § 388 does not impose a duty to inspect, the comment states that a duty to inspect may nonetheless be imposed under different rules, such as § 392.

Indeed, comparison of § 388 with other sections reaffirms that there is no affirmative duty to investigate under § 388. *See Larner v. Torgerson*, 93 Wn.2d 801, 806, 613 P.2d 780 (1980) ("In addition to the duty to warn of known dangers, which is imposed by section 388, section 392 also adds a duty upon the supplier to make a reasonable inspection."). The scope notes in the *Restatements* to this topic remind us that §§ 388-90 apply equally to all persons who supply chattel, whereas other rules may provide additional or more specific duties on certain specified activities. RESTATEMENT ch. 14, topic 1 scope note.

Reinland had a duty to warn under § 388 only if he knew or had reason to know of the dangers posed by the chlorine tank. There is no evidence that he knew of the chlorine tank, much less its dangers. Nor is there evidence that Reinland had reason to know that the bulk scrap metal would include a pressurized chlorine tank. Reason to know does not mean "should know." Instead, it requires knowledge of facts that would make it "so highly probable" that a chlorine tank would be found among the scrap metal that

15

Reinland should have warned users of the chattel of the likely danger. Schuck does not

make this argument. Such an argument would defeat his claim under § 388 because it

would apply equally to each subsequent user. *See Bailey v. Gammell*, 34 Wn. App. 417,

420, 661 P.2d 612 (1983) (if dangerous condition of stairs was evident from their

appearance, so as to create a "reason to know," then the condition would also be evident

to the user and defeat liability under similar failure to warn rule); *Zamora v. Mobil Corp.*,

104 Wn.2d 199, 704 P.2d 584 (1985) (A bulk seller has no duty to warn retailer of the

dangers of a product if retailer is already aware through common knowledge or learning

of a specific hazard).

Because there is no evidence that Reinland knew or had reason to know that the

tank existed, much less that it was dangerous, the plaintiff's claim under § 388 should be

dismissed. Because I would grant Reinland's summary judgment and dismiss Schuck's

claim under § 388, I do not address Reinland's additional defenses of obvious danger or

sophisticated user.

D.  SECTION 392 — DUTY TO WARN GIVEN NATURE OF CHATTEL

I concur with the majority that summary judgment was improper on a theory of

liability under § 392. While generally speaking, under § 388 a supplier has no duty to

investigate chattel for dangerous conditions, a duty may arise under another rule. One

such rule is § 392. While § 388 applies to all suppliers, § 392 applies to persons

supplying chattel for business purposes. Section 392 is titled "Chattel Dangerous for

16

Intended Use." As the majority notes, § 392 provides that a business supplier is liable for damages caused by the foreseeable use of chattel if the supplier fails to exercise reasonable care to make the chattel safe for its foreseeable use or fails to exercise reasonable care to discover its dangerous condition and provide a warning. RESTATEMENT (SECOND) OF TORTS § 392 (1965). In other words, § 392 creates an affirmative duty to inspect chattel that is provided for the business purposes of the supplier.

In this case, Schuck raises a material issue of fact as to whether Reinland exercised reasonable care to discover the pressurized chlorine tank and either make it safe or warn of its dangers. The activity, however, of recycling scrap metal or disposing of chlorine tanks is not abnormally dangerous because it is regularly done in a safe manner with the exercise of reasonable care.

In sum, I dissent with the majority's decision to find absolute liability and impose it sua sponte upon Reinland. I also disagree with the majority's interpretation and application of *Restatement* § 388. I concur with the remainder of the majority's opinion.

_____
Staab, J.

17